## Case No. 16,096.

### UNITED STATES v. PRYOR.

[3 Wash. C. C. 234.] [1]

Circuit Court, D. Pennsylvania. April Term, 1814.

TREASON—FURNISHING PROVISIONS TO ENEMY.

1. Indictment for treason, in adhering to the enemy; charging the defendant, inter alia, with going from the British squadron to the state of Delaware, with intention to procure provisions for the squadron.

2. The going from the British squadron to the shore, for the purpose of peaceably procuring provisions for the enemy, did not amount to an act of treason; as this conduct rested in intention, which is not punishable by our laws.

3. Aliter, if a person has carried provisions towards the enemy, with intent to supply him, though that intention should be defeated.

4. If the intention of the defendant had been to procure provisions for the enemy, by uniting with him in hostilities against the citizens of the United States, his progressing towards the shore would have been an overt act of adhering to the enemy, though no other act was committed.

---

[2] [From 12 Int. Rev. Rec. 34.]
[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

This was an indictment for treason. The first four counts, charged the prisoner [William Pryor] with adhering to the enemy, giving them aid and comfort; by taking on board at Philadelphia a cargo of provisions, and carrying it to the squadron which blockaded the Delaware, in April, 1813. The other counts charged the defendant with the same species of treason, by going from a British seventy-four, whilst lying in Delaware Bay, to the shore of the state of Delaware, with intention to procure provisions for the blockading squadron. The evidence given in behalf of the prisoner, so completely exonerated him from any treasonable conduct, under the counts which charged him with having adhered to the enemy in this district, that these counts were abandoned by the prosecuting officer, in his summing up to the jury. As to the court charging him with overt acts of treason, committed in Delaware Bay, and on the Delaware shore, the evidence was as follows: The prisoner, having, on his passage from Philadelphia to New York, loaded with flour, been chased by a British vessel of war, and captured, about forty miles to the north of the capes, was conducted, with the prize, to Commodore Beresford, who then commanded the British squadron in the Delaware Bay. He was received on board as a prisoner, where he met with many of his countrymen in the same unhappy situation. It appeared, that he frequently conversed with his fellow-prisoners upon the subject of attempting their escape; but the difficulties which seemed to attend every plan he proposed, appeared to be insurmountable. At length he inquired of one of the prisoners, if he could conduct him to any part of the Delaware shore, where he could obtain a parcel of bullocks for the use of the ship; and was answered in the affirmative. He then obtained a number of men from the commodore, to accompany him on shore for the purpose of obtaining live stock; and also a flag of truce, which was taken into the vessel which was to carry them to the shore. The men who accompanied him, took their arms and ammunition along with them. When they landed on the Delaware shore, the prisoner who had attended Pryor as a guide, deserted, whilst affecting to go after a parcel of cattle, seen at a distance. The prisoner, together with a British lieutenant, went about two miles into the country, and stopped at a house, where the former endeavoured to purchase some bullocks or other live stock, and urged strongly his request, that the countryman would sell to him, by stating his unhappy situation as a prisoner, separated from his family, who resided in Massachusetts; and that by obtaining the articles which he sought to purchase, it would be in his power to ransom, not only himself, his vessel and cargo, but his fellow-prisoners, from captivity. All his efforts, however, to procure provisions by purchase, proved abortive; and no attempt was made, or hinted at, in the most remote manner, to obtain them by force or intimation. In the course of that evening, whilst supping at the farmer's house, the militia made their appearance; and the prisoner, with his companion, were seized and sent to the governor of Delaware, who ordered them to Philadelphia, where Pryor underwent an examination, and was committed for trial. It appeared fully in evidence, that when he first landed, he inquired of a countryman, (from whom also he endeavoured to purchase provisions, professing the same motives which he afterwards urged to another countryman, as above stated,) out of the hearing of the British officer, whether there was any of the militia at hand; and being answered that they certainly would assemble at a particular place called the "Landing," he requested, and strongly urged the countryman, to accompany him to that place, with which he complied. It was near the Landing that he was taken. The commanding officer of the militia who took the prisoner, observed a party of the British soldiers, who had accompanied him on the shore with a flag, and approached them with a view to learn what were their intentions. He found them with arms in their hands, and at his request they accompanied him to the place where the militia were stationed, amongst whom they distributed all the ammunition which they had brought on shore.

It was stated by one witness, the man who came on shore to guide the party to the bullocks, that the prisoner informed him, before they left the seventy-four, that the flag was to be taken on board of the boat, to be used only in case they should be overpowered by the persons they might meet on the shore; and that in fact, it was not hoisted at the mast-head, at any time on their passage to the shore, or after they came to anchor. Two other witnesses proved, that they looked from the shore at the vessel, and could not see the flag. On the part of the prisoner, it was proved, by one witness who went in the vessel to the shore, that the flag was hoisted when they set sail, and continued so during the whole time previous and subsequent to their coming to anchor. In corroboration of this, a correspondence between the governor of Delaware and Commodore Beresford, was given in evidence, in which the former inquired into the cause of the landing which had been made, and complained of the conduct of those who had done so, in coming armed, whilst they pretended that they had come under the protection of a flag. The latter answered, that they had been sent with a flag, for the purpose of purchasing provisions; and he condemned the officer who commanded the party, for taking arms with him.

Mr. Dallas contended, that though the prisoner failed in his design of obtaining provisions for the enemy, after he landed in Delaware, yet, as his intention was treason-

able, his getting into the boat and proceeding to the shore, in order to carry that intent into execution, was an overt act of adhering to the enemy. But, if not so, his going in hostile array, with a design to use the protection of the flag, only in case of the party being overpowered by the Americans, the proceeding a single step in execution of such an intention, was an overt act. He insisted, that, upon the evidence, it did not appear, that the flag was at any time hoisted. As to the motives attributed to the prisoner for engaging in this unlawful enterprise, viz. the obtaining the means of ransoming himself, or of escaping, they would not, if proved, be sufficient to excuse him from the charge of treason.

WASHINGTON, Circuit Justice (charging jury). That the prisoner went from the British seventy-four to the shore, with an intention to procure provisions for the use of the enemy, is incontestibly proved, and, indeed, is not denied by his counsel. If this constituted the crime of treason, the motives which induced him to attempt the commission of it, and by which there are the strongest reasons to believe he was most sincerely actuated, would certainly palliate the enormity of it. But the law does not constitute such an act treason, even although these motives had not existed; and, although intentions and feelings as disloyal as ever stained the character of the most atrocious traitor, were proved against the prisoner. Can it be seriously urged, that if a man, contemplating an adherence to the enemy, by supplying them with provisions, should walk towards the market-house to purchase, or into his own fields to slaughter whatever he might find there, but should, in fact, do neither one or the other of the intended acts, he has committed an overt act of adhering to the enemy? Certainly not. All rests in intention merely, which our law of treason in no instance professes to punish. Carrying provisions towards the enemy, with intent to supply them, though this intention should be defeated on the way, would be very different from the act of going in search of provisions for such a purpose, and stopping short before any thing was effected, and whilst all rested in intention. In such a case, the motives which induced the prisoner to use his exertions to procure provisions, would take from his conduct every possible imputation of disloyalty and disaffection to his country. The intention to procure the means of effecting the liberation of himself and his fellow-prisoners, had it even been carried into execution, would have been an honest and generous one; even although the law should not have excused the act. If the object of the prisoner was to break his parole, after he had got to land, and to escape; it is one which would not meet our approbation. We can never be the apologist of disingenuous conduct, let who will

practise it; and we are firmly of opinion, that nations, as well as individuals, will always find their best interests to be promoted by fidelity to their engagements, and by manifesting a disposition, too proud to descend to artifices to deceive even an enemy. But, although, as moralists, we cannot approve of an intention in the prisoner to violate the promise he had plighted to the enemy, yet, as judges, we must pronounce, that by doing so, he would have offended against no law of his country. But, if the intention of the prisoner was to procure provisions for the enemy, by uniting with him in acts of hostility against the United States or its citizens, which is chiefly pressed against him by the district attorney; then, indeed, it must be admitted, that his progressing towards the shore, was an overt act of adhering to the enemy, although no act of hostility was in fact committed.

But how stands the evidence as to this fact. The only witness who proves any thing in relation to such an intention, is the black man who was applied to by the prisoner, to conduct him to some place where bullocks might be procured; and he states, that the prisoner told him that the flag was only to be used, in case it should be necessary to shield the party against superior numbers. Now, this is so highly improbable, that it is fair to conclude, that the witness must have misunderstood what the prisoner said to him. The prisoner could not have been ignorant of what every person must know, that no officer, in any army, would dare to violate a flag of truce, by attempting, under any circumstances, to use it as a cover for acts of hostility. No officer would expose himself to the punishment which the laws of war would compel his superiors to inflict upon him, and which it would be their interest not to disregard, if they meant, on any future occasion, to claim the immunities annexed to a flag of truce.

But it is denied, that this vessel, during her passage to the shore, or during her stay near to it, hoisted the flag, or appeared to seek its protection. The evidence of the same black man to this effect, is flatly contradicted by the pilot, who was on board during the whole time; and who declares, that it was flying at the mast-head during her passage to, at, and from the shore; and that many American vessels, which passed her, and who might otherwise have been seized as good prize, were suffered to proceed without inquiry or molestation. In short, during the whole time that this party was absent from the ship of war, all was peace with them. But what seems almost to conclude this point, is the official declaration of Commodore Beresford to the governor of Delaware, that this vessel went to the shore under the protection of a flag, with a view to purchase provisions. Now, this evidence is not to be discredited by saying that it proceeded from an enemy; because, all civilized

nations are bound to give credit to the official declarations of the commander of the enemies' forces. There is no American, who would not feel a just indignation, if a British officer should venture to question the veracity of an American commanding officer, in relation to a fact which he stated officially as being within his own knowledge. There is no doubt, that accompanying the flag by armed men, was an irregularity; and Commodore Beresford very properly censures the officer who commanded the party, for carrying arms. Nevertheless, no act of hostility was attempted, nor is there the slightest reason to believe, that any was meditated by the prisoner, or by any of the party.

Upon the whole, it is the opinion of the court, gentlemen, that the undertaking of the defendant to procure provisions from the shore, for the use of the enemy, and his proceeding to the shore with this intent, as laid in the eighth and ninth counts in the indictment, did not amount to overt acts of treason.

The jury, without leaving the bar, found a verdict of not guilty.

NOTE. It being the wish of the counsel for the prisoner, to try fairly all the charges which could be brought against him, to prevent his being sent to Delaware to be tried again, for the treasons alleged to have been committed in that state, no observations were made in the charge, upon the form of the eighth and ninth counts in this indictment; but the case was considered in the same manner, as if they had charged the prisoner with an intention to procure provisions by force, leaving the prisoner to move in arrest of judgment, if a verdict had been found against him.