## Case No. 14,756.

### UNITED STATES v. CATHCART.

### SAME v. PARMENTER.

[1 Bond, 556.][1]

Circuit Court, S. D. Ohio. Feb. Term, 1864.

TREASON—SECESSION ORDINANCES—UNITED STATES CONSTITUTION—SUPREME LAW.

1. The seceding ordinances of a portion of the states did not abrogate the constitution of the United States, or release the citizens of any state from their obligation of loyalty to the government of the United States, and a citizen or resident of any state may, therefore, be indicted and punished for treasonable acts against that government.

2. The government of the United States is not a compact between the several states, from which any state may withdraw at pleasure, with or without cause.

3. The constitution of the United States was ordained and established, not by the states in their sovereign capacities, but, as the preamble emphatically declares, by the people of the United States; and the government of the Union emanates from the people, and is a government for the people.

4. The government of the Union, though limited in its powers, is supreme within its sphere of action, and laws passed pursuant to the constitution, form the supreme law of the land.

[These were indictments against Charles W. H. Cathcart and against Catherine Parmenter. Heard on a demurrer, and on a motion to quash.]

Flamen Ball, U. S. Dist. Atty.
William M. Corry, for defendants.

LEAVITT, District Judge. In the first of these cases, a special demurrer to the in-

---

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

dictment has been filed; and in the second. there is a motion to quash. The indictments in both cases are substantially the same in their structure; and the questions raised on the demurrer, and in the motion to quash, being the same, it will be unnecessary to consider them separately, as the judgment in one case will be decisive of the other. The views now stated by the court have special reference to the grounds of demurrer in Cathcart's case.

The indictment contains two counts. The first count avers that there is now existing an open and public war or rebellion, carried on with force and arms by the so-called Confederate States of America, against the government and laws of the United States; and that the defendant, owing allegiance to the government of the United States, in violation of such allegiance has levied war against the same by banding together with others in military array; and thus has committed treason against the United States. The second count, after reciting the existence of the rebellion or war, as averred in the first count, charges that the defendant knowingly and willfully conspired with others, and did assist and give aid and comfort to those in rebellion or war against the United States, and in the execution of his traitorous adhesion to the enemies of the United States, committed several overt acts of treason, which are specifically set forth, but which it is unnecessary here to recite.

The first count is based on the first section of the act of congress of July 17, 1862 [12 Stat. 589], to suppress insurrection, punish treason, etc., which provides that every person who shall hereafter commit the crime of treason against the United States, and shall be adjudged guilty thereof, shall suffer death, or fine and imprisonment, as the court may direct. The second count is based on section 2 of said act, which declares "that if any person shall hereafter incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States or the laws thereof, or shall give aid and comfort thereto, or shall engage in, or give aid and comfort to any such existing rebellion or insurrection, and be convicted thereof, shall be liable to fine or imprisonment, or both, at the discretion of the court."

There are several exceptions to the indictment, which are set out in the special demurrer. The first one stated has been abandoned, and need not be noticed. The second exception is for duplicity in the second count in averring a conspiracy of several persons to aid in several distinct offenses. (3) Misjoinder of a count for felony, and for a misdemeanor. (4) No averment that the crimes charged were committed within any county in the Southern district of Ohio. (5) Repugnance in both counts in averring the crimes charged to have been committed against the government of the United States and also the people of the United States. (6) The crimes are charged to have been committed against the allegiance of the defendant, when they can only be against obedience, and because of the agreement of the state of Ohio, and of all the other states, to the constitutional compact binding on the citizens of Ohio and of each state, so long as the compact remained. (7) That treason or conspiracy against the United States after the refusal of some of the states to continue the constitutional compact, are no longer possible.

The sixth and seventh causes of demurrer, involved also in the motion to quash, are yet to be considered. They have been recited as set out in the demurrer, in a previous part of this opinion, and it is not necessary to restate them here. Both present substantially the same question, and may, therefore, be discussed together. They affirm, that from the facts alleged in the indictment, it is impossible that the crime of treason against government of the United States can be committed. In a legal sense, the demurrer admits the truth of the facts alleged in the indictment. One of these facts is, that the United States is now engaged in a war for the suppression of a rebellion against the government by the people of certain states, aiming at the overthrow of the constitution and the establishment of another government. It is insisted that the states in rebellion have abrogated the compact by which they were bound to the Union, and that this compact being dissolved, by their ordinances of secession, neither a citizen of one of the states thus seceding, nor of any state not involved in the acts of secession, can commit the crime of treason against the government of the United States. In support of this position, certainly somewhat startling in its character, it is insisted that the constitution, instead of creating an actual and efficient government for the whole people of the United States, is a mere league or compact, from which any state, or any number of states, may at any time withdraw, with or without cause, and without or against the consent of the people of the other states, as caprice, passion, or interest may dictate; that the states, when they entered into the Union and became parties to this league or compact, were sovereign and independent; that the allegiance of the people of each state was due exclusively to the state in which the citizen had his domicile, and the allegiance being inalienable and indivisible, could not be and has not been transferred, in whole or in part, to the government of the United States, and remains, therefore, with the people of the individual states, whose obligations of allegiance are wholly due to the state in which they live; that when the people of a state, in any way they may see proper to prescribe, ignore, or repudiate such league or compact, they are thereby absolved from all obligation of obedience or allegiance to the government of the United States; and that, if they take the attitude of armed rebellion against it, with the avowed purpose of its overthrow, they can not be punished as rebels or traitors.

And as the necessary and logical result of this theory, it is urged that if a citizen or resident of a state, which has not seceded, but which remains faithful and loyal to the government, adheres to those thus in rebellion, and supports and sustains them in their criminal attempts, he is not guilty of treason and can not be held accountable for that crime, under the laws or authority of the United States.

These are in substance the points made by counsel in support of the two last grounds of demurrer. The argument has been greatly extended, and the domain of political metaphysics has been fully explored in its progress. I have listened patiently to the statement of the views of counsel, though not without some surprise that they should have been urged with such apparent gravity and earnestness, before this court, on a purely legal question, with the full knowledge that they were in direct conflict with the solemn and well-considered adjudications of the supreme court of the United Sates, and the views of numerous elementary writers of the highest reputation as jurists. I am at a loss to comprehend on what grounds counsel could have supposed this court would sustain a theory so entirely at variance, not only with the decisive authorities to which I shall refer, but with the uniform action of every department of the general government from its organization to the present day. It is obvious that the counsel throughout his argument has addressed himself to the question, what, in his judgment, the structure of our government should have been, and not what it is. It seemed, therefore, to the court, that however appropriate the peculiar views of counsel may have been, if urged in a popular assembly to rectify a supposed erroneous public sentiment, or in a convention to amend the constitution, or reconstruct the government, they were wholly out of place on the question, whether the averments and structure of the indictment in this case, were sufficient in law to put the defendant on trial before a traverse jury. The manner of counsel was, however, unexceptionably courteous, and his views were presented with seeming earnestness and sincerity. It is due, therefore, to the occasion, and to the position I occupy, that I should state some of the reasons why I can not assent to the principles he has urged upon the attention of the court. And, in the first place, I will refer to some of the adjudicated cases in which these principles have been discussed and settled by men whose intellectual power and profound knowledge of the structure of our government, entitle them to the highest measure of respect and veneration. And I may remark here, that in so far as these principles are embodied and propounded in the judicial decisions of the supreme court, they are positively authoritative on this court, as a subordinate court of the United States. In the case of Martin v. Hunter's Lessee, 1 Wheat. [14 U. S.] 304, 3 Pet. Cond. R. 575, the supreme court says: "The

constitution of the United States was ordained and established, not by the states in their sovereign capacities, but emphatically, as the preamble of the constitution declares, by the people of the United States. There can be no doubt that it was competent to the people to invest the general government with all the powers, which they might deem proper and necessary, to extend or restrain those powers according to their own good pleasure, and to give them paramount and supreme authority." The opinion of the court in this case was delivered by Justice Story, and was concurred in by the whole court, including Chief Justice Marshall. In McCulloch v. State of Maryland, 4 Wheat. [17 U. S.] 316, Chief Justice Marshall delivering the opinion of the court, it is decided "that the government of the Union is a government of the people; it emanates from them; its powers are granted by them, and are to be exercised directly on them, and for their benefit." Again: "The government of the Union, though limited in its powers, is supreme within its sphere of action; and its laws, when made in pursuance of the constitution, form the supreme law of the land."

Judge Story, in discussing the question whether the constitution of the United States is a compact between the several states, remarks that there is nowhere found upon the face of the constitution any clause intimating it to be a compact, or in any wise providing for its interpretation as such. On the contrary, the preamble emphatically speaks of it as a solemn ordinance and establishment of government. The language is: "We, the people of the United States, do ordain and establish this constitution for the United States of America." Commentaries on the Constitution (Abr. Ed.) 117. And again (page 119) the learned author says: "But that which would seem conclusive on the subject is the very language of the constitution itself. This constitution, says the sixth article, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." And he adds: "If it is the supreme law, how can the people of any state, either by any form of its own constitution or laws, or other proceedings, repeal, abrogate, or suspend it?" And again he says: "This of itself imports legal obligation, permanence and uncontrollability by any but the authorities authorized to alter or abolish it." And again, on this subject, the learned writer says (page 684): "It would be a perfect solecism to affirm that a national government should exist with certain powers, and yet in the exercise of those powers should not be supreme."

I will add to these references a brief notice of the case of Ableman v. Booth, 21 How. [62 U. S.] 506, decided by the supreme court of the United States in 1858, which sustains fully the general doctrines affirmed by the prior decisions of that court. I make this reference

with the more satisfaction because the opinion was written and delivered by Chief Justice Taney, a judge eminent for his profound legal learning, and who has never been charged with extreme liberality in construing the constitution of the United States, and defining the powers of the general government. In that case, a judge of a state court in Wisconsin had discharged a party on habeas corpus who was in custody under the authority of the United States. The supreme court of the state sustained the action of the lower judge; and the case was removed to the supreme court of the United States by writ of error, in accordance with section 25 of the judiciary act of 1789 [1 Stat. 85]. I shall give but brief quotations from the opinion of the court, indicating their views on the subject under consideration. On page 516, the court say: "Although the state of Wisconsin is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the constitution of the United States. And the powers of the general government and of the state, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a state judge or a state court, as if the line of division was traced by landmarks and monuments visible to the eye." Again, on page 517, the court say: "The constitution was not formed merely to guard the states against danger from foreign nations, but mainly to secure union and harmony at home; for if this object could be obtained there would be little danger from abroad; and, to accomplish this purpose, it was felt by the statesmen who framed the constitution, and by the people who adopted it, that it was necessary that many of the rights of sovereignty which the states then possessed should be ceded to the general government; and that in the sphere of action assigned to it, it should be supreme, and strong enough to execute its own laws by its own tribunals, without interruption from a state, or from state authorities. And it was evident that anything short of this would be inadequate to the main objects for which the government was established." And the court further say: "The language of the constitution by which this power is granted is too plain to admit of doubt, or to need comment. It declares that 'this constitution, and the laws which shall be passed in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.'" On page 524, the court further say: "Nor is there anything in the supremacy of the general government, or the jurisdiction of

its tribunals, to awaken the jealousy or offend the natural and just pride of state sovereignty. Neither this government nor the powers of which we are speaking were forced upon the states. The constitution of the United States, with all the powers conferred on it by the general government, and surrendered by the states, was the voluntary act of the people of the several states, deliberately done, for their own protection and safety against injustice from one another." And they add (page 525): "Now it certainly can be no humiliation to the citizen of a republic to yield a ready obedience to the laws as administered by the constituted authorities. On the contrary, it is among the first and highest duties as a citizen, because free government can not exist without it. Nor can it be inconsistent with the dignity of a sovereign state to observe faithfully, and in the spirit of sincerity and truth, the compact into which it voluntarily entered when it became a state of this Union. And certainly no faith could be more deliberately and solemnly pledged than that which every state has plighted to the other states to support the constitution as it is, in all its provisions, until they shall be altered in the manner which the constitution itself prescribes."

A still more recent decision of the supreme court, in the Prize Cases, as they are called, 2 Black [67 U. S.] 635, strongly affirms the doctrines previously declared by that court. In the very able and lucid opinion of Mr. Justice Grier, giving the views of the court (page 673), he says: "Under the very peculiar constitution of this government, although the citizens owe supreme allegiance to the federal government, they owe also a qualified allegiance to the state in which they are domiciled." And it may be proper here to remark that the principles enunciated in the case just referred to, are pertinent to the questions before this court on this demurrer in another aspect. The argument of the counsel for the demurrant is, that a citizen of a state can not be guilty of treason against the United States by adhering to, or giving aid and comfort to those now in rebellion against the government, because it is a mere insurrection or civil war, waged by the seceding states against the government. But in the Prize Cases the doctrine is very impressively announced that the rebellion has all the attributes of a foreign or public war, and that all the duties, obligations, disabilities, and penalties incident to such a war attach to every citizen. In a word, that those who are particeps criminis in the rebellion are not the less traitors because they are rebels. In that case the court say: "It (the law of nations) contains no such anomalous doctrine as that which the court are now for the first time desired to pronounce—to wit: that insurgents who have risen against their sovereign, expelled her courts, established a revolutionary government, organized armies and commenced hostilities, are not enemies because they are

traitors; and a war levied on the government by traitors in order to dismember and destroy it, is not war, because it is an insurrection." And again the court say: "When the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts of justice can not be kept open, civil war exists, and hostilities may be prosecuted on the same footing as if those opposing the government were foreign enemies invading the land." And further on in the opinion, as descriptive of the true character of the present rebellion, the court say: "It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force; south of this line is enemies' territory, because it is held in possession by an organized, hostile, and belligerent power."

Such are some of the deliverances of the highest judicial tribunal of the Union. They repudiate emphatically the mischievous heresy that the union of the states under the constitution is a mere league or compact, from which a state, or any number of states, may withdraw at pleasure, not only without the consent of the other states, but against their will. They deny the assumption that full and unqualified sovereignty still remains in the states or the people of a state, and affirm, on the contrary, that, by express words of the constitution, solemnly ratified by the people of the United States, the national government is supreme within the range of the powers delegated to it; while the states are sovereign only in the sense that they have an indisputable claim to the exercise of all the rights and powers guarantied to them by the constitution of the United States, or which are expressly or by fair implication reserved to them.

I might, perhaps close this opinion here. But the course of the learned counsel in his argument seems to justify, if it does not call for some additional views. And the first remark is, that apart from the light which the high judicial authorities to which I have referred has thrown on the subject under discussion, I should have arrived at the same conclusions which they announce. It is my strong conviction that the language of the constitution, in connection with the known history of its origin, formation, and adoption, leaves no room for a doubt as to the character and structure of the government which it created. Its history is well authenticated, and bears upon every page the indelible stamp of truth. I can not, on an occasion like this, refer to or adduce the many facts which throw light upon the views and intentions of the eminent patriots and statesmen to whom we are indebted for our inimitable constitution. One thing is certain, the American people are in no danger of estimating their services too highly, or according to their memories a measure of honor which is not justly their due. With the illustrious Washington at their head, they entered upon the arduous duty of reconstructing the government under circumstances of deep depression and gloom. The confederation under which the Union had for some time existed, had proved a lamentable failure, and was on the verge of dissolution from its own inherent weakness. The hearts of the patriots who had toiled and bled in the revolutionary struggle for national liberty and independence, were stirred to their inmost depths, from an apprehension that their great achievements would prove fruitless of the results which they had anticipated. They felt deeply the truth that, in framing a new structure of government, they must avoid the rock on which the old one had foundered, and must, above all things, incorporate an element of power to bind the states in an indissoluble national union. This is plainly indicated in the preamble, which declares as one of the objects of the constitution, the formation of "a more perfect union," and is apparent not only from the debates in the convention, but from the language used throughout the entire instrument. After months of anxious toil and earnest deliberation, the present constitution was agreed to, and submitted to the people for their sanction and adoption. It was adopted by conventions in all the states, elected by the people for this purpose; and thus as the act of the people became the organic law. Its framers did not claim for it entire perfection; and contemplating the possibility that time would develop some necessary changes, wisely provided for its amendment by the same authority that had ordained and established it. It is not proposed to enter upon an extended discussion of the powers of the government, under the constitution thus framed and adopted. That it was designed to institute a government of the people, and for the people of the United States, and to confer upon it, within the powers granted or fairly implied, the attributes of sovereignty or supremacy, can not admit of a question. There is, in the language of the supreme court in a case before referred to, a qualified allegiance due to the state in which the citizen has his domicile, but it is subordinate to the allegiance due to the supreme government. The government, therefore, has a perfect right to exact, and has exacted from every one enjoying its protection, the duty of fidelity and allegiance. And it is certainly a fact, worthy of note, that there is not a word or phrase in the constitution of the United States which gives the least countenance to the theory that a state can obstruct or nullify the authority of the general government, exercised within its constitutional limits. Much less can the supreme folly of giving its sanction to the right of any state, or any number of states, to withdraw at will from the Union, be imputed to the constitution. Such a provision could not be viewed in any other light than as a solecism in the

structure of a government. It would be substantially a provision for its own dissolution, without the sanction or agreement of the power which created it.

But I am not at liberty to extend this discussion. I may remark, in closing, that there were those in the convention which framed the constitution, and in the conventions of the states which ratified it, who objected to it because it created a national consolidated or supreme government of the United States. There was no difference of opinion then as to the character of the government which the constitution created, but the ground of its opponents was, that it did not conform to their views of what it should be. The counsel has referred in his argument to the resolutions of the legislatures of Virginia and Kentucky, passed in 1798, as giving sanction to the doctrine of the right of a state, at any time, to interpose its authority to prevent or provide a remedy for the unconstitutional exercise of authority on the part of the general government, and that they sanction what is called the right of nullification, or even of secession. I can not assent to the proposition that. properly understood, they justify such a conclusion. The history of these resolutions is well known to the American people. They were designed for a special political object, which was effected, in part at least, through their instrumentality. They affirmed that the states, being parties to the constitutional compact, "in case of a deliberate, palpable, and dangerous exercise of powers not granted by the compact, have a right, and are in duty bound to interpose to prevent the progress of the evil." A distinguished statesman has well observed, in commenting on these resolutions, that "the sort of interposition intended was left in studied obscurity." But Mr. Madison, who was the author of the resolutions adopted by the Virginia legislature, in his report to that body in 1799, asserts distinctly that no extraconstitutional measures were intended. And thirty years later, during the administration of General Jackson, when certain prominent Southern politicians insisted that nullification was the proper remedy, in case of an invasion of the rights of a state, solemnly and earnestly protested against this construction of the Virginia resolutions. "He earnestly maintained that the separate action of an individual state was not contemplated by them, and that they had in view nothing but the concerted action of the states to procure a repeal of unconstitutional laws, or an amendment of the constitution." And in 1832, when Mr. Calhoun had succeeded in inducing South Carolina to pass an ordinance of nullification, on the avowed ground of the unconstitutionality of the laws imposing duties on imports, and that state was on the verge of open rebellion, the sturdy arm of Andrew Jackson was raised to crush it in the bud. Before resorting to force for this purpose, with a paternal anx-

iety for the people of that state who had been deluded by the false political teachings of their leaders, he issued his memorable proclamation, addressed to the people of that state. It is a document which well deserves to be cherished in the memories of the American people to the latest ages. It is alike remarkable for the earnest devotion of its author to the union of the states, the elevated patriotism which is exhibited in every line, and its able and unanswerable exposition of the true principles and theory of the government. The fallacies of the nullification party were held up as dangerous political heresies. Its effects upon the whole country were electrical. It was clothed with the power of truth, and carried conviction to the minds of all men of all political parties whose intellects were not so constructed as to be impervious to the voice of reason, or dead to the impulses of patriotism.

But though the iron will and sturdy sense of President Jackson had thoroughly rebuked and arrested the heresy for the time, the deadly poison was not wholly eradicated from the Southern mind. After the lapse of thirty years, its baleful effects have appeared in a new and more malignant form. That which was nullification in 1832, is secession in 1860. The political leaders in the Southern states, by means which I do not care to recite, have so far succeeded in their treasonable machinations as to induce those states madly to leap into the fiery vortex of secession. They have gone through the mockery of passing ordinances, in which they declare they are no longer parties of the solemn compact of government, and repudiate all allegiance to it. They have inaugurated war against that government and have been in armed rebellion against it for nearly three years. If successful, the overthrow of the government is the inevitable result, for secession, having no warrant in the constitution, is revolution. The authorities charged with the solemn duty of preserving and perpetuating the government, have found it imperatively necessary to meet force by force, and have adopted measures to repel and subdue the criminal designs of those in rebellion. The country is in a state of war—a war which the adjudications of the supreme court have declared to be lawful and constitutional. A struggle is in progress which, at one time, jeopardized the very life of the government. In such a crisis, it is now gravely urged in a court deriving its being and authority from a constitution which the judges are sworn to support, that a citizen of the patriotic and loyal state of Ohio, charged with criminal complicity in the rebellion, can not be guilty of treason, because the revolted states had a right to withdraw from the Union; and, as a logical and legal result, have virtually destroyed the entire fabric of the government, and absolved the people of the United States from all obligation of allegiance to it! As a judge, and as a citizen of the United

States, I am constrained to enter my protest against such a dangerous perversion of the principles of the constitution. To sanction such a position, under circumstances now existing in our country, implies, in my judgment, a most unenviable condition of intellect, and the possession of a measure of courage, physical and moral, to which I can lay no claim. The character and tendencies of this doctrine are not now to be settled by unmeaning abstractions and metaphysical speculations. The period when these could have been available has gone by, and the bitter fruits of this sad error are now fully developed in its practical results. It has plunged those who have been its deluded victims into one of the deadliest conflicts the world has ever witnessed. Its blighting influences are now frightfully apparent in the wide-spread suffering, desolation, and ruin, which it has brought upon the states which have so madly raised the banner of revolt. The loyal states, too, have laid liberal offerings on the altar of sacrifice. In their patriotic devotion to the government of their fathers, and impelled by a stern, unconquerable purpose of defending, preserving, and perpetuating it, they have cheerfully borne a severe trial of their energies, and profusely lavished their treasures and poured out their blood. The sacrifice, though costly, we may well hope, will be fully repaid by the end to be achieved.

I have now only to say, that upon none of the grounds urged, can the exceptions to this indictment be sustained. The demurrer, as also the motion to quash in the case of Catherine Parmenter, are therefore overruled.