PETERSON v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.    May 11, 1914.)

No. 2316.

1. RECEIVING STOLEN GOODS .(§ 9*)—TRIAL—INSTRUCTIONS.

Under Cr. Code, § 288 (Act March 4, 1909, c. 321, 35 Stat. 1145 [U. S. Comp. St. Supp. 1911, p. 1675]), providing that whoever shall buy or receive any money or goods which has been feloniously taken or stolen, knowing it to have been so taken or stolen, shall be punished as therein provided, it was error to charge that the jury might infer knowledge that the property was stolen, from circumstances that should suffice to satisfy a man of ordinary intelligence and caution that it was stolen, that whatever would carry knowledge or induce a belief in the mind of defendant that the property was stolen, or that would induce it in the mind of a reasonable person, under the same circumstances, would, in the absence of countervailing evidence, be considered sufficient to apprise defendant or induce in his mind a like belief, that defendant was charged with what he knew or was put upon inquiry to know, that the jury could convict if defendant had such knowledge as would put a reasonable man upon inquiry from which he could ascertain the truth, or if he purchased with knowledge, belief, or a reasonable suspicion that he failed to investigate for fear he would learn that the property had been stolen, since the gist of the offense is the actual state of defendant's mind and not what might have been the state of mind of some other person, and, while knowledge need not be acquired by personal observation nor shown by direct testimony, the jury must find knowledge and not merely a suspicion, especially where the purchase was for full value without secrecy, concealment, or subsequent denial, there was no attempt to dispose of the property for an inadequate price, and the vendor was without a bad reputation.

[Ed. Note.—For other cases, see Receiving Stolen Goods, Cent. Dig. §§ 19–22; Dec. Dig. § 9.*]

2. CRIMINAL LAW (§ 865*)—TRIAL—COERCING VERDICT.

On a trial for receiving stolen cattle, where the jury retired on Friday afternoon and, after being out until 11 o'clock Saturday morning, reported that they had agreed as to one defendant but were unable to agree as to the other two defendants, it was error for the court, after inquiring and ascertaining that the jury stood 7 to 5, to charge that the case should be finally disposed of as to all defendants, that it was the second trial of the case, and that there was no reason to believe that a more intelligent or honest jury more likely to arrive at a verdict could be drawn on another trial, that justice demanded that the case be brought to an end, that the expense of the trials was very great, that the government had a right to a verdict without a further expenditure of time and money, and defendants, if guilty, a right to have that fact determined before they were bankrupt, and, if innocent, a right to be acquitted before their means were exhausted, that, if seven jurors were for an acquittal, the others should seriously inquire whether there was not a reasonable doubt, and, if the seven were for conviction, whether there was a reasonable doubt, and that they should further consider the case; the court believing that they could honestly come to an agreement, especially where, in less than an hour, they returned a verdict acquitting one defendant and convicting the other.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2069; Dec. Dig. § 865.*]

3. CRIMINAL LAW (§ 1172*)—HARMLESS ERROR—INSTRUCTIONS—TESTIMONY OF ACCOMPLICES.

On a trial for receiving stolen cattle from B., an instruction that B., if defendants knew he was selling them stolen stock, would be an accom-

plice, that that would lead the jury to give his testimony serious consideration and scan it very carefully, that they should do that anyhow because he had been convicted of stealing the stock, and they should take that into consideration in weighing his evidence, but that they should take his evidence in connection with all the evidence and circumstances to determine whether, upon the whole, they were satisfied beyond a reasonable doubt of defendants' guilt, though a meager instruction upon the weight to be given to B.'s testimony, was not prejudicially erroneous.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3128, 3154–3157, 3159–3163, 3169; Dec. Dig. § 1172.*]

In Error to the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Mitchell Peterson was convicted of receiving stolen goods, and he brings error. Reversed and remanded.

W. F. O'Leary, of Great Falls, Mont., and E. A. Carleton of Helena Mont., for plaintiff in error.

B. K. Wheeler, U. S. Atty., of Butte, Mont., and Homer G. Murphy, Asst. U. S. Atty., of Helena, Mont.

Before GILBERT and ROSS, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge. The plaintiff in error, Mitchell Peterson, hereinafter referred to as the defendant, was found guilty of buying and receiving stolen cattle, and was sentenced to imprisonment for one year and a day in the penitentiary, and to pay the costs of prosecution, taxed at $1,189.35. Jointly with Walter Peterson, Oscar Peterson, Melvin Peterson, his brothers, and Charles Peterson, his father, he was charged upon four different counts. Apparently at the first trial of the case two of the defendants were acquitted, and there was a disagreement as to the other three, including this defendant. Upon this, the second trial, the defendant was found guilty upon the first count, and acquitted upon the other three; his codefendants were found not guilty.

[1] The first count, which is the only one we need now consider, charges that on the 21st day of October, 1910, within the Blackfeet Indian Reservation, in the state of Montana, where the defendants resided, they bought a steer and three cows, knowing them to have been stolen. It was admitted at the trial that the purchase was made from one John Bostwick, by whom it was further admitted the stock had been stolen. The statute upon which the charge is based (section 288 of the federal Penal Code of 1910) is as follows:

"Whoever shall buy, receive, or conceal, any money, goods, bank notes, or other thing which may be the subject of larceny, which has been feloniously taken, stolen, or embezzled, from any other person, knowing the same to have been so taken, stolen, or embezzled, shall be fined not more than one thousand dollars and imprisoned not more than three years; and such person may be tried either before or after the conviction of the principal offender."

It therefore appears that substantially the only issue before the jury was whether or not, when he purchased the cattle, the defendant knew they had been stolen. It is not disputed that he paid Bostwick their

full value, or that he purchased and received them openly and placed his brand, or that of his family, upon them in the usual manner.

It is assigned as error that the court incorrectly construed the statute. In defining the word "knowing," the court advised the jury that:

"It is not necessary that he who buys should see the thief taking the property, nor is it necessary that the thief should tell him he stole the property, but if the circumstances and conditions surrounding the purchase, and the nature of the property, and all, are such that it can be inferred by you, as reasonable men, that the defendant had knowledge, you have a right to draw that inference. You may infer such knowledge from circumstances that should suffice to satisfy a man of ordinary intelligence and caution that the property was stolen."

And again:

"Whatever would carry knowledge or induce a belief in the mind of a defendant that the property was stolen, that would induce it in the mind of a reasonable person under the same circumstances, it would, in the absence of countervailing evidence, be considered by you sufficient to apprise the defendant, or induce in his mind a like belief."

And again:

"He (the defendant) is charged with what he knows or what he is put upon inquiry to know."

And again the jury were instructed that they could convict the defendant if he "knew the property was stolen, knew, as I have heretofore indicated to you, not necessarily the actual knowledge, but such knowledge as would put a reasonable man upon inquiry from which he could ascertain the truth."

And again the jury were told that the defendant could be convicted if he purchased the cattle "with knowledge, belief, or a reasonable suspicion, that he failed to investigate for fear he would learn the truth that the same had been stolen."

It is thought that the meaning thus given to the statute is somewhat broader than its language warrants, and, in view of the repetition of the instruction in slightly varying forms, there is little doubt that the jury were guided thereby. Congress used the word "knowing," and defined the crime as the purchase of stolen property by one having knowledge of the theft. It might have denounced as a crime the receipt of stolen property under conditions sufficient to create a suspicion in the mind of a reasonable man, but it did not do so. The gist of the offense is the actual state of the defendant's mind when he purchases the property, and not what, under like circumstances, might be the state of mind of some other person; the standard by which guilty knowledge is to be imputed is the defendant's mental attitude, and not that of the imaginary average man. It is doubtless true, as was said by the court, that it is not necessary to show knowledge by direct testimony, nor is it essential that the accused have actual or positive knowledge such as one acquires by personal observation of a fact. It is not required that he should see the thief taking the property, or that the thief should have told him he stole the property. Knowledge may be inferred from circumstances. Anything amounting to notice, whether such notice be direct or indirect, positive or inferential, will satisfy the statute. But, even so, the ultimate fact which the jury must find be-

fore a conviction is warranted is that the defendant had such knowledge; and knowledge is something more than a. suspicion. Moreover, circumstances which would create a strong suspicion in the mind of one man might have little significance for another, and one is not to be convicted of a crime because he is of a less suspicious nature than the ordinary man, and where, therefore, he may have acted in entire good faith in the face of conditions which might have put another upon his guard. These considerations are peculiarly pertinent here, where, as it appears, the full value was paid for the property, there was no secrecy in the purchase, no subsequent concealment or denial of the purchase, no attempt to dispose of the cattle for an inadequate price, and the vendor was without a bad reputation. As was said of a similar instruction in the case of State v. Rountree; 80 S. C. 387, 61 S. E. 1072, 22 L. R. A. (N. S.) 833:

"There is no doubt as to the well-settled rule in civil actions that knowledge of such facts as are sufficient to put a reasonably prudent man on inquiry is equivalent to notice, but such is not the rule in cases arising under the foregoing section of the Criminal Code. * * * It cannot be successfully contended that a mere inadvertent failure to pursue an inquiry with reasonable diligence is the equivalent of guilty knowledge and of fraudulent intent, which are essential elements of the crime, as otherwise a person could be punished under the statute for negligence, unaccompanied with intentional wrong. Knowledge of the theft on the part of the receiver is an essential element of the offense, and such knowledge must exist at the moment the property is received."

In State v. Denny, 17 N. D. 519, 117 N. W. 869, the following instruction was held to be erroneous:

"Guilty knowledge is made out and sufficiently proven to warrant conviction in that respect by the proof that the defendant received the property under such circumstances as would satisfy a man of ordinary intelligence and caution that they were stolen."

In State v. Daniels, 80 S. C. 368, 61 S. E. 1073, the following:

"Where a person has knowledge of facts, or has suspicions that would induce a person of ordinary prudence to make an inquiry, then he is required to do so. If he fails to do so, he is as much bound by what may be the state of facts as if he had been openly informed as to what they were. If the defendant had notice of facts that would put him on inquiry, he is bound to pursue those facts, and, if he fails to do so, it is at his own risk."

So in State v. Goldman, 65 N. J. Law, 394, 47 Atl. 641, the following:

"That which a man ought to have suspected, in the position of the defendant, he (the defendant) should have suspected, and he must be regarded as having suspected, in order to put himself upon his guard and upon inquiry. The proof in any case is to be inferential."

See, also, Cohn v. People, 197 Ill. 482, 64 N. E. 306; Sanford v. State, 4 Ga. App. 449, 61 S. E. 741; Minor v. State, 55 Fla. 90, 45 South. 818; Territory v. Claypool, 11 N. M. 568, 71 Pac. 463.

In the main, we do not find the language used by the lower court objectionable, and we should hesitate to grant a reversal upon this ground alone, if the record disclosed strong incriminating evidence, but the circumstances relied upon are so meager and so remote that

we are constrained to think that the defendant was prejudiced in his rights.

[2] Turning now to another instruction complained of. It seems that the jury first retired to consider of their verdict on Friday afternoon, and, after being out for some time, they returned into court for further instructions, which were given. They again retired, and, after remaining out all night, came into court about 11 o'clock Saturday morning, and, through their foreman, reported that they had agreed as to the defendant Walter Peterson, but were unable to agree as to the other two. Thereupon the following statement was made to them by the court:

"The court at this time declines to receive a verdict as to one defendant. The case should be finally disposed of as to all. This is, as you know, the second trial. To try it again means to try it before a jury drawn from the same community that you have been, and with no reason to believe that they would be any more intelligent or honest than you are or any more likely to arrive at a verdict. Justice to both parties demands that the case be brought to an end. The expense of these trials is very great; possibly the expense of the parties so far incurred is from $7,000 to $10,000. The government has a right to a verdict without farther expenditure of time and money. The defendants, if guilty, have a right to have that fact determined by a verdict before they are bankrupt in pocket, and likewise if they are innocent they have the right to be acquitted before their means are exhausted. You state, in answer to the court's question, that you stand seven to five. If seven are for an acquittal, the five should seriously inquire whether there is not a reasonable doubt of the guilt of the defendants when seven of their fellows of equal intelligence and honesty have found that there is; if seven are for conviction, the five should equally seriously inquire whether there is a reasonable doubt of the guilt of the defendants when seven of their fellows of equal intelligence and honesty find there is no doubt. After three days spent in the trial of this case, with no reason to believe that it can be any better tried before another jury, the court is disposed to direct you to further consider the case, believing that you can honestly come to an agreement."

Considerable latitude is to be allowed the trial judge in impressing upon the jurors their duty at all times earnestly to endeavor, by a candid comparison of views and fair argument, to reach an agreement, and we are not disposed narrowly to limit this discretion. This we have recently decided in the case of Suslak v. United States, 213 Fed. 913, 130 C. C. A. 391, also arising in the Montana district. But we are unable to give our sanction to the language here used; it is plainly coercive in its general spirit and tendency. We doubt whether it would be warranted even in the most extreme case, where the evidence is so overwhelming as to leave little, if any, room for doubt, and where plainly a disagreement would amount to a miscarriage of justice; but this is not such a case. The charge upon which the defendants were being tried is one upon which it is not generally thought to be difficult to secure a conviction in this section of the country; the prosecution faced no popular prejudice; the personality of the defendants and their standing in the community were not such as to create a disturbing influence which it was necessary to counteract. And, in the most favorable view that can be taken of it, the evidence was doubtfully sufficient to warrant a conviction. Already one jury had been unable to reach an agreement, and this jury had spent many hours in a vain attempt to get together. To such a situation the language of the Su-

preme Court in Burton v. United States, 196 U. S. 283, 306, 307, 25 Sup. Ct. 243, 249, 250 (49 L. Ed. 482), is most pertinent; it was there said:

"Here was a case of very great doubt in the minds of some of the jury. It had deliberated for more than 36 hours and been unable to agree upon a verdict. * * * Balanced as the case was in the minds of some of the jurors, doubts existing as to the defendant's guilt in the mind of at least one (here at least five), it was a case where the most extreme care and caution were necessary in order that the legal rights of the defendant should be preserved. * * * A slight thing may have turned the balance against the accused, under the circumstances shown by the record. * * * "

It appears that here inquiry was first made of the jurors as to how they were divided, and it was thereupon disclosed that they stood five to seven. Of this practice the court said, in the Burton Case, supra:

"Such a practice is not to be commended, because we cannot see how it may be material for the court to understand the proportion of * * * division of opinion among the jury. All that the judge said in regard to the propriety and duty of the jury to fairly and honestly endeavor to agree could have been said without asking for the fact as to the proportion of their division; and we do not think that the proper administration of the law requires such knowledge or permits such a question on the part of the presiding judge. Cases may easily be imagined where a practice of this kind might lead to improper influences, and for this reason it ought not to obtain."

Although after continuous deliberation for nearly a day, the case was thus almost evenly balanced in the minds of the jurors, and, after presumably all legitimate argument had been employed, the presiding judge addressed them in such a way as to leave the inference that the five should in some way defer to the seven. True, if a jury were very unequally divided, as, for example, eleven to one, it might not be improper, in a guarded manner and with appropriate qualifications, to suggest to the one the propriety of most carefully testing the correctness of his conclusion, in the light of the opposite views entertained by his eleven associates, presumably of equal intelligence and fairness. But here, without cautioning the jurors against yielding their honest, conscientious convictions, whatever they may have been, to mere numbers or to considerations of economy, the presiding judge unqualifiedly told them that "the case should be finally disposed of as to all" defendants. "The government has a right," it was said, "to a verdict without farther expenditure of time and money." And the instruction was closed by the expression of a "belief" that the jurors could "honestly come to an agreement." The court might very well have expressed the hope for such an agreement, but it is difficult to conceive what basis there was at that juncture for believing that the jury could honestly agree. It is to be borne in mind that nowhere did the court make it clear that, however desirable it might be to avoid another mistrial and finally to terminate the prosecution, an agreement should not be reached in violation of the honest conviction of any one of the jurors. It was not correct to say that the government had a right to a verdict without farther expenditure of time and money; it had only a right to a fair consideration of the case. No obligation rested upon it to make any further expenditure, for, in case of a mistrial, it would

have been the right, if not the duty, of the prosecuting officers to dismiss the prosecution. In any event, it was not its right to demand an agreement; nor did the defendant have such right. But one impression could have been left upon the minds of the jurors, and that such impression was made is borne out by the event. They retired, and in less than an hour returned with a verdict acquitting the one defendant and convicting the other, and this without any new light upon the law, or any further suggestion from the court as to the significance or character of any of the evidence in the case, and after the jury had deliberated the larger part of a day, with the resultant conviction upon their part that they could not get together. Can there be any question that, retiring with the impression that the all-imporant thing was a final disposition of the case, the jurors consciously or unconsciously bartered the acquittal of one defendant for the conviction of the other?

[3] Inasmuch as the judgment must be reversed and the cause remanded for further proceedings, and the evidence may be different if another trial is had, we do not deem it necessary to discuss the defendant's contention that the court should have instructed the jury to acquit. The assignments touching rulings upon objections to the evidence are not thought to be well founded. The assignment relating to the right of the defendant to a speedy trial was practically abandoned at the hearing. The instruction bearing upon the weight to be given to the testimony of the witness Bostwick was meager, but we think without prejudicial error. The assignment of the failure of the record affirmatively to show arraignment or plea may be summarily disposed of by citing the recent decision of the Supreme Court in the case of Garland v. State of Washington, 232 U. S. 642, 34 Sup. Ct. 456, 58 L. Ed. ——.

The judgment is reversed, and the case remanded for further proceedings.