### SHAFFMAN et al. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. April 25, 1923.)

No. 2899.

1. **Conspiracy ⟨⟩43(6)—Indictment for conspiracy to aid bankrupts in concealing property from their trustee held good.**

An indictment charging that defendants conspired that certain persons should engage in business and become bankrupt, and that they, with defendants, should fraudulently conceal merchandise and goods from their trustee, *held* to charge the offense of conspiracy to aid and abet the commission of a crime, under Bankruptcy Act, § 29b (Comp. St. § 9613), which under Criminal Code, § 332 (Comp. St. § 10506), would make them principals.

2. **Conspiracy ⟨⟩28—Conspiracy is punishable, though intended crime is not accomplished.**

A conspiracy to commit a crime is punishable, whether or not the objective crime is accomplished.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Conspiracy** &#x24B8;&#x21E8;28—**Person may be guilty of conspiracy, though incapable of committing the objective crime.**

 The gist of a charge of conspiracy is the conspiracy, and not the objective crime, and a person may be guilty of conspiracy to commit a crime, though incapable of committing the objective offense.

4. **Witnesses** &#x24B8;&#x21E8;323—**When cross-examination by prosecution of its own witnesses is permissible.**

 Where a prosecutor is taken by surprise by the failure of witnesses called by him to testify to facts to which they had previously testified, it is proper to permit their examination as on cross-examination, and the use of their former testimony to refresh their recollection.

5. **Criminal law** &#x24B8;&#x21E8;768(3)—**Coercion of verdict by court ground for reversal.**

 If the charge of the court as a whole, on a fair and reasonable interpretation, had, or was calculated to have, the effect of coercing the jury into rendering a compromise verdict, the judgment must be reversed, but the trial judge is vested with a wide latitude of discretion.

6. **Criminal law** &#x24B8;&#x21E8;768(3)—**Instruction held not erroneous, as calculated to coerce verdict.**

 A supplemental instruction, given at the request of the jury for advice after their failure to reach an agreement, impressing on them that the purpose of the trial was to arrive at a just verdict, and that it was their duty to adjust their honest differences by comparison of views and discussion of the evidence, but without intimating what their verdict should be, *held* not erroneous, as calculated to coerce a verdict.

In Error to the District Court of the United States for the Western District of Pennsylvania. W. H. Seward Thomson, Judge.

Criminal prosecution by the United States against Jacob Shaffman and Frank M. Zola. Judgment of conviction, and defendants bring error. Affirmed.

Edward B. Goehring, Morris D. Canter, and Gwilym A. Price, all of Pittsburgh, Pa., for plaintiffs in error.

Walter Lyon, U. S. Atty., Arnold M. Replogle, Asst. U. S. Atty., and John M. Henry, all of Pittsburgh, Pa., for the United States.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

DAVIS, Circuit Judge. The defendants, Jacob Shaffman and Frank M. Zola, were tried and convicted on an indictment charging them and others, who were acquitted, with conspiring to violate section 29 of the Bankruptcy Act of 1898 (Comp. St. § 9613). According to the indictment the defendants conspired that Nathan Kotman and Ben Kotman, doing business under the firm name of Kotman & Kotman, should engage in general merchandise business, wholesale and retail, in the city of Pittsburgh, and with the knowledge and connivance of each of the other co-conspirators should commit acts of bankruptcy, with a view to causing and inducing the filing of a petition in bankruptcy against them; that a trustee should be appointed, and that they, with the defendants, should conceal from the trustee in bankruptcy, thereafter to be appointed, moneys, merchandise, and goods belonging to the estate in bankruptcy of Kotman & Kotman.

The evidence tended to establish that early in 1919 there appeared in Pittsburgh a man known as N. Kotman, who in the spring opened an

account in the Union Savings Bank, Pittsburgh, under the name of Kotman & Kotman, and an account in his indivdual name. He was introduced to the bank by Abe Millstone, one of the defendants, who was acquitted. Nathan Kotman was introduced to the Pittsburgh State Bank by the defendant Shaffman as his cousin, and opened an account in that bank also. Shaffman introduced him as his cousin also to Mr. Isaac Weinstein, owner of properties located at Nos. 501–503 Carson street, Pittsburgh, where Kotman conducted his operations.

The method by which Kotman & Kotman seem to have carried out their alleged scheme was to establish a line of credit by ordering and paying for a small quantity of merchandise, and, when credit had thus been established, larger orders were given, which were not paid for. As the merchandise came in, it was immediately transferred to the places of business of Millstone, Shaffman, and others "who were partners to the scheme," and whose purpose it was to "continue this until the place was looted, and then have the people connected with the business disappear. N. Kotman was last seen in September, 1919, and nobody was ever able to locate him after that time. It was impossible to discover any person who held himself out as Ben Kotman."

Although plaintiffs in error denied any knowledge of the business of Kotman & Kotman, large quantities of the goods were shipped from the Carson street premises, at first under the name of Kotman & Kotman, and later under the name of A. Millstone, to Frank M. Zola, Milwaukee. Zola had a fire, and the proof of loss submitted to the insurance company showed that he had purchased goods from Kotman & Kotman, A. Millstone, and Shaffman—in fact, nearly all the goods he had came from these three persons. Zola was Millstone's brother-in-law and Shaffman was his son-in-law. "N. Kotman was brought to the Millstone house to live by Jacob Shaffman, and was introduced to the Millstones as his cousin," and lived there during the Kotman operation in Pittsburgh. A. Millstone's daughter, Anna, was employed in the Kotman & Kotman establishment as stenographer. Zola wrote Kotman at one time that he could use $10,000 worth of merchandise "with 30 off," which was explained by Zola as meaning 30 per cent. less than cost. On July 26, 1919, Zola called on the Rice-Dix Dry Goods Company, St. Louis, Mo., represented himself as the buyer of Kotman & Kotman, and purchased for them merchandise in the amount of $775.10, which was never paid for.

The jury returned a verdict of guilty, and the defendants contend that the judgment based thereon should be reversed for three principal reasons:

[1] The first is that the indictment does not sufficiently set out a crime. The indictment charges that the several defendants conspired that Kotman & Kotman should become bankrupts, and "that a trustee in bankruptcy should be appointed for said Kotman & Kotman, and that said defendants, and divers other persons unknown, should willfully and fraudulently conceal from the said trustee in bankruptcy * * * merchandise and goods belonging to the estate in bankruptcy of the said Kotman & Kotman." This is insufficient, defendants urge, because the crime of concealment from a trustee in bankruptcy can be

committed by the bankrupt only, and the charge that the defendants, Shaffman and Zola, were to conceal, does not constitute a crime. Section 29b of the act of 1898 provides that:

"b. A person shall be punished, by imprisonment not exceeding two years, upon conviction of the offense of having knowingly and fraudulently (1) concealed while a bankrupt, or after his discharge, from his trustee any of the property belonging to his estate in bankruptcy."

In the case of United States v. Stevens (D. C.) 44 Fed. 132, 140, Stevens, Dickey, and Strum were indicted for conspiring to make false census certificates and fictitious returns. The defendant Strum, an official enumerator, was the only person who could commit the crime under the act denouncing the objective offense. The court held that, although Stevens and Dickey could not commit the offense as principals, they could aid and abet Strum in the commission of the substantive crime, and could be punished as principals; and so the indictment charging them with conspiracy to commit the substantive crime, which Strum alone could commit, was held good. This case was cited with approval by the Supreme Court in United States v. Holte, 236 U. S. 140, 147, 35 Sup. Ct. 271, 59 L. Ed. 504, L. R. A. 1915D, 281. The indictment in the instant case charged that the bankruptcy of Kotman & Kotman was "to be brought about and accomplished by the said Nathan Kotman and Ben Kotman, with the knowledge and connivance of each of the said other conspirators." Admitting that the defendants other than the two Kotmans, as principals, could not be guilty of concealing assets in bankruptcy, in violation of section 29b of the act of 1898, under the doctrine of the Stevens Case, they could be aiders and abettors, and as such punished as principals. Section 332, Federal Penal Code (Comp. St. § 10506).

[2, 3] Clearly all the defendants might have been charged with having conspired that Kotman & Kotman should become bankrupts, and that they themselves should conceal property belonging to their estate in bankruptcy. This exact question was decided in the case of the United States v. Rabinowich, 238 U. S. 78, 35 Sup. Ct. 682, 59 L. Ed. 1211. Is it fatal to the indictment that it charged that all the defendants were to commit the objective crime, and not Kotman & Kotman only? The gist of the charge is the conspiracy, not the objective crime. Peter Rulovitch et al. v. United States (C. C. A.) 286 Fed. 315. And the conspiracy is punishable, if the intended crime be accomplished. Heike v. United States, 227 U. S. 131, 144, 33 Sup. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128. And it is also punishable if it is not accomplished. Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278. All the conspirators need not join in the overt act. Bannon & Mulkey v. United States, 156 U. S. 464, 468, 15 Sup. Ct. 467, 39 L. Ed. 494. A person may be guilty of conspiracy, although incapable of committing the objective offense. United States v. Holte, supra; United States v. Rabinowich, supra; Williamson v. United States, supra.

Since it is not necessary that all the conspirators join in the commission of the objective offense, the crime would be complete if the bankrupts alone concealed, and the other defendants, charged with them,

took no part in effecting the object of the conspiracy. The charge that all the defendants were to conceal included the bankrupts, who admittedly could conceal without the aid of their co-conspirators.

[4] The second ground the defendants rely on is the ruling of the trial judge on evidence. The United States attorney called as witnesses Jacob Goldslager and Solomon Neustein, and sought to elicit from them certain facts to which they had testified in the bankruptcy proceedings of Kotman & Kotman before Referee Blair. They were expressmen, and were questioned about hauling merchandise from the Carson street premises occupied by Kotman & Kotman. While their memory seemed good on other subjects, they were, apparently, unable to remember anything whatever about the defendants in relation to the business conducted at the Carson street premises. The United States attorney endeavored in various ways and by numerous questions to elicit from them facts to which they had freely testified before the referee in bankruptcy, but they persisted in the statement that they did not remember. To practically every question touching the business of the defendants at the Carson street store, and what they did in hauling express for the Kotmans, they answered, "I don't remember." It was evident that they were biased, or had been brought under hostile influence. Consequently the trial judge allowed the United States attorney to examine them as under cross-examination, and to use their former testimony to refresh their recollection. The government was evidently surprised, and under such circumstances "the weight of authority seems in favor of admitting the party to show that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial, or to what the party had reason to believe he would testify, or that the witness has recently been brought under the influence of the other party, and has deceived the party calling him." Their testimony before the referee was not used to impeach or discredit them, but simply to stimulate their recollection, and under the circumstances was permissible. 1 Greenleaf on Evidence (16th Ed.), § 444.

We have reviewed the other assignments of error relating to the action of the judge upon matters of evidence, without finding error.

[5] The remaining reason urged upon us for reversal is that the learned trial judge in his supplemental charge coerced the jury into a compromise verdict. He addressed the jury as follows:

"In a memorandum signed by your foreman, you have indicated how the jury stand, and have asked the court's advice. I can only say to you that the purpose of a trial is to arrive at a verdict, a just verdict, not to a disagreement. It is the duty of the jury to agree upon a verdict. That is the purpose of the trial. With two indictments before you, and various counts, there is abundant room to adjust all honest differences. It is your duty to adjust them, by comparison of views and discussion of the evidence, having your minds at all times open to the truth as it may be impressed upon you by fair argument and a true presentation of the evidence. Such a method, adopted by reasonable men, having due regard to the opinions of your fellow jurymen, will almost inevitably lead to an agreement, and a just verdict. On the other hand, a dogged persistence in a position which will not listen to a fair argument, or to the persuasive force of reason, is destructive of justice, and has no place in the jury box. The court will remain in session until 4 o'clock, to receive your verdict, if you can agree in that time. If not, you can

seal your verdict and be discharged, rendering your verdict in open court on Tuesday morning. And I hope you will have a Merry Christmas."

This supplemental charge was delivered to the jury upon its request for advice. A verdict must be the result of the conscientious conviction of the jury, based upon a careful and reasonable consideration of the evidence, under the instruction of the court as to the law. If the charge as a whole, upon a fair and reasonable interpretation, had, or was calculated to have, the effect of coercing the jury into rendering a compromise verdict, the judgment must be reversed. Peterson v. United States, 213 Fed. 920, 130 C. C. A. 398; People v. Sheldon, 156 N. Y. 268, 50 N. E. 840, 41 L. R. A. 644, 66 Am. St. Rep. 564; People v. Faber, 199 N. Y. 256, 92 N. E. 674; Burton v. United States, 196 U. S. 283, 304, 25 Sup. Ct. 243, 49 L. Ed. 482. The trial judge, however, is vested with a wide latitude of discretion. He may by repeated instructions impress upon the jury the importance of the case, their duty to reach a verdict, and in so doing urge each juror to question the mental processes by which he has reached his conclusions, and test them by a fair consideration of the arguments of the other jurors, and by a comparison of their views with his own, provided he leaves the jury free to reach its own conclusions and record its own conscientious convictions. United States v. Allis (C. C.) 73 Fed. 165, 182; Id., 155 U. S. 117, 123, 15 Sup. Ct. 36, 39 L. Ed. 91; United States v. Ingham, et al. (D. C.) 97 Fed. 935; Suslak v. United States, 213 Fed. 913, 919, 130 C. C. A. 391; Campbell v. United States, 221 Fed. 186, 136 C. C. A. 602; Bernal v. United States, 241 Fed. 339, 154 C. C. A. 219.

[6] The jury in the case at bar retired to consider the case at 12:30 o'clock in the afternoon on Friday, December 23, 1921. The next afternoon it returned at 2:30 o'clock and asked the court's advice. The trial judge reminded them that the purpose of the trial was to arrive at a "just verdict"; that it was their duty to adjust their "honest differences" "by comparison of views and discussion of the evidence," having their minds at all times open to the truth as it might be impressed upon them "by fair argument and a true presentation of the evidence," and that "as reasonable men" they were to regard the opinions of their fellow jurymen in order to arrive at a "just verdict."

The judge went perhaps as far as he should have gone in impressing upon the jury its duty to reach a "just verdict," if it could do so; but we do not think that his language amounts to coercion, and the judgment is affirmed.