**TOMOYA KAWAKITA v. UNITED STATES.**

No. 12061.

United States Court of Appeals, Ninth Circuit.

June 22, 1951.

Rehearing Denied Sept. 24, 1951.

Morris Lavine, Los·Angeles, Cal., for appellant.

Ernest A. Tolin, U. S. Atty., Norman W. Neukom, Robert J. Kelleher and Jack E. Hildreth, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before STEPHENS, BONE and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

Tomoya Kawakita appeals from a judgment of conviction and a sentence of death imposed after a United States District Court jury returned a verdict finding him guilty of treason against the United States of America.

## I.

Appellant was born in Calexico, California, on September 26, 1921, of Japanese-born parents who were nationals of Japan. By virtue of his birth appellant was a citizen of the United States. United States Constitution, Amend XIV, Sec. 1; United States v. Wong Kim Ark, 1898, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890. By virtue of the nationality of his parents appellant was at birth a national of Japan. Kiyoshi Hirabayashi v. United States, 1942, 320 U.S. 81, 97, 63 S.Ct. 1375, 87 L.Ed. 1774.

In 1939, at the age of 17, appellant applied for and was issued a passport and, with his father, went to visit his grandfather in Japan. The father returned to the United States but the son remained in Japan and attended a preparatory school

for "Niseis", or persons born in the United States of Japanese parents. In March, 1941, appellant entered Meiji University in Japan where he took a course in commerce and also received military training. In April, 1941, he renewed his passport. Although war broke out between Japan and the United States in December, 1941, he remained at the University, completed his course of study and graduated. Although of military age and, so far as the record goes, physically fit, at no time did he enter or serve in the armed forces of Japan and there is nothing in the record to indicate that he tried to enter the armed forces or that the Japanese government did anything toward bringing him into its armed forces. While at the University he was registered as a foreigner or alien at the local police station. In 1943, through his uncle Yazaemon Kawakita, he applied for and received permission as of March 8, 1943, to have his name entered in the family register, or "koseki tohon".

Upon graduation from the University, appellant requested assistance from one Takeo Miki, a member of the Japanese House of Representatives. Miki, a friend of the father's, had been furnishing appellant with financial assistance during his schooling. Miki assisted in obtaining employment for appellant as an interpreter with the Oeyama Nickel Industry Company, Ltd.,[1] the employment beginning in August, 1943, and continuing until after the surrender by Japan on August 10, 1945.

The company with which appellant was employed was a private corporation, engaged in mining, milling, producing and processing metals for munitions and for other uses. Adjoining the factory, located at Oeyama in Kyoto Province on the west side of the Japanese Island of Honshu, was a prisoner-of-war camp, supervised and directed by Japanese military personnel. About ten or twelve miles from the prisoner-of-war camp was a surface mine where the prisoners-of-war were required to work from time to time. Medical attention was furnished the prisoners by a British and an American Army doctor, both

prisoners-of-war, in a barracks set aside as a "hospital". Appellant began his employment in the camp in August of 1943, and shortly thereafter British and Canadian prisoners-of-war arrived. His duties consisted of interpreting between the British and Canadian prisoners-of-war and the Japanese military foreman in charge of the camp.

In 1944 and early in 1945, approximately four hundred American prisoners-of-war arrived at the camp. These consisted primarily of men who had been captured on Bataan early in 1942. As a result of approximately two and one-half years of inadequate diet, confinement and hard work, all of the Americans were underweight and were suffering from malnutrition and a variety of other ailments.

The work done at the mine by the American prisoners consisted of digging nickel ore from the face of the mountain side, and loading it onto cars which were emptied into hoppers. The prisoners also performed other general labor in the mine area, including such duty as carrying logs to be used for construction and maintenance work.

The overt acts upon which the treason charges in the indictment are based were alleged to have occurred during the period from August 8, 1944, up to and including August 24, 1945.

After the Japanese surrender on August 10, 1945, the camp was turned over to the Americans. Thereafter it appears that Kawakita performed some services for the Americans, being of assistance particularly because of his knowledge of the English language. While he remained in Japan during the post-war period he was not charged with having committed any acts of treason.

In December of 1945, appellant went to the United States consul in Yokohama to inquire about his United States citizenship: There he made an "Application for Registration", in which he stated that he was a United States citizen, that he had not been naturalized as a citizen of a foreign state

---

1. Also referred to in the indictment as "Nippon Yakin Kogyo Kabushiki Kaisha", or "Nippon Metallurgical Industry Co., Ltd." or "the company."

and that he had not taken an oath of allegiance to a foreign state. Before a foreign service officer he swore allegiance to the United States.

On the same date he signed a document entitled "Affidavit by Native American to Explain Protracted Foreign Residence" in which he stated: That he had come to Japan to study Japanese; had graduated from Meiji University; that he possessed "dual nationality", Japanese as well as American from birth, but that his name was not entered in his uncle's census register until March 8, 1943.

The foreign service officer who took appellant's affidavit concluded that " * * * He has presented evidence deemed satisfactory to overcome presumption of expatriation." We set out the officer's findings of fact in the margin.[2]

On June 19, 1946, appellant applied for a United States passport and again took an oath of allegiance to the United States. He also swore to an "Affidavit to Overcome Presumption of Expatriation", in which he stated that his reason for foreign residence since his registration on December 31, 1945, was to await transportation to the United States. He affirmed that since January 13, 1941, he had not entered, or served in, the armed forces of any foreign state and that he had not accepted or performed the duties of any office, post, or employment under the government of any foreign state or political subdivision thereof for which only nationals of such state were eligible.

He was issued a United States passport on June 20, 1946, and departed Japan on or about August 2 or 3, 1946, enroute to the United States.

On his return to the United States appellant went to live with his father in Los Angeles, California, where he enrolled at the University of Southern California as a student.

In October, 1946, he visited a store in Los Angeles, and William Bruce, who had been a prisoner-of-war at Oeyama, in the store at the time, recognized appellant as one who had served the Japanese at the camp, and reported that fact to the authorities.

On June 5, 1947, appellant was arrested by an agent of the Federal Bureau of Investigation in Los Angeles and arraigned before a Commissioner on the same day. An indictment charging him with treason was returned by the United States Grand Jury on June 11, 1947, to the United States District Court for the Southern District of California.[3] Fifteen overt acts of treason

2. "He came to Japan in 1939, aged 18, for educational purposes, and upon completion of his schooling here was unable to return to his family in the U.S. because of the war. He now desires to return as soon as transportation is available. In view of these facts it is believed that he has satisfactorily explained his protracted foreign residence.

"Inasmuch as he was born prior to 1924 and has never divested himself of Japanese nationality he has had dual nationality from birth. In 1943 his possession of Japanese nationality was made a matter of record by the entry of his name into his uncle's Family Census Register. He states that this action was taken under severe pressure by the Japanese police and by his uncle, on whom he was financially dependent after his supply of funds from the U.S. was cut off; this office has reason to believe this statement.

"In the opinion of this office he has not actively collaborated with the enemy nor engaged in activities inimical to the best interests of the U.S. beyond the minimum necessary to earn a livelihood. A check of the records of the U.S. Army CIC in Japan reveals no adverse information concerning him.

"When the war began he was in possession of a valid American passport and was currently registered at the Consulate General, Tokyo.

"He is at present employed by a private Japanese business firm and hence it is not felt that his continued residence in Japan contributes to the prestige or general welfare of the U.S.

"In view of the above facts his registration has been approved locally to be valid for one year, to December 31, 1947, [sic] which is believed to be a sufficient time for him to effect his return to the United States. * * *."

3. Former Title 28 U.S.C.A. § 102, Act of March 3, 1911, c. 231, § 41, 36 Stat. 1100, provided: "The trial of all offenses committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

were charged. The text of those found to have been committed is set out in the margin.[4] We briefly relate them further on in this opinion.

New Title 18 U.S.C.A. § 3238, Act of June 25, 1948, c. 645, 62 Stat. 826, is substantially the same.

The trial was properly held in the district where appellant was "found". See Chandler v. United States, 1 Cir., 1948, 171 F.2d 921; Best v. United States, 1 Cir., 1950, 184 F.2d 131.

4. "(a) Defendant Tomoya Kawakita, on a date in May, 1945, the exact date of which is to the grand jury unknown, at the said smelter operated by the company near Camp Oeyama, did direct the work of Phillip D. Toland, a member of the armed forces of the United States who was then and there a prisoner of war, to compel him to remove rock from the roadbed and track of a railroad used in the operation of said smelter, and did kick the said Phillip D. Toland to compel him to greater exertion in said work.

"(b) Defendant Tomoya Kawakita, during the latter part of April, 1945, the exact date of which is to the grand jury unknown, at said Camp Oeyama did direct and participate in the following inhuman and degrading punishment of one, J. C. Grant, a member of the armed forces of the United States who was then and there a prisoner of war at said Camp Oeyama; said J. C. Grant was knocked into the drain or cesspool of said camp by his Japanese guards and was repeatedly and violently struck and beaten by the defendant and the said Japanese guards as he attempted to get out of the pool, thereby sustaining injuries, shock and exposure.

"(c) During December, 1944, at Camp Oeyama, on a date to the grand jury unknown, the defendant Tomoya Kawakita and the Japanese guards did line up about thirty members of the armed forces of the United States who were then and there prisoners of war in Camp Oeyama and as punishment of said prisoners of war for making mittens and shoe linings from pieces of blankets for protection from cold weather conditions and did at said time and place strike and beat them and force them to strike and beat each other.

"(d) During August, 1945, the exact date of which to the grand jury is unknown, the defendant Tomoya Kawakita, at Camp Oeyama, did impose punishment on one Thomas J. O'Connor, a member of the armed forces of the United States, and then and there a prisoner of war in said camp, for a breach of camp rules by assaulting, striking, and beating said Thomas J. O'Connor and repeatedly knocking him into the drain or cesspool of the said camp, causing the said Thomas J. O'Connor temporarily to lose his reason.

"(g) On a date in July or August, 1945, the exact date of which is to the grand jury unknown, a work detail consisting of members of the armed forces of the United States who were then and there prisoners of war at said Camp Oeyama, including in their number one David R. Carrier and George W. Simpson, returned thirty minutes early from their assigned duties as such prisoners of war and were compelled by the Japanese sergeant in charge to run twice around the inner quadrangle of the buildings of said camp and thereafter the defendant Tomoya Kawakita did compel the said David R. Carrier and George W. Simpson, who were unable to run fast enough by reason of illness resulting from their captivity, to run an additional four times and six times respectively around said quadrangle of said camp.

"(i) That on or about December 17, 1944, at or near the said open pit ore mine, the defendant, Tomoya Kawakita, did order and compel Johnie T. Carter, then and there a member of the armed forces of the United States and a prisoner of war at Camp Oeyama, to carry a heavy log up an ice-covered slope; that the said Johnie T. Carter, who was then and there suffering from malnutrition and in a weakened physical condition, slipped and fell and received a serious spinal injury; that the defendant, Tomoya Kawakita, then and there denied medical care to the said Johnie T. Carter and delayed his removal to Camp Oeyama for a period of approximately five hours.

"(j) On a date in May, 1945, the exact date of which is to the grand jury unknown, the defendant Tomoya Kawakita, at a warehouse near Camp Oeyama, did order and command John J. Armellino, a member of the armed forces of the United States, who was then and there a prisoner of war at said Camp Oeyama, and weak and emaciated, to carry for a distance of approximately 500 feet two heavy buckets of white lead instead of one bucket which Armellino had been carrying, and did then and there strike and beat the said John J. Armellino in order to compel him to perform this labor.

Kawakita entered a plea of "Not Guilty" to all of the charges made.

The trial began on June 18, 1948. The jury[5] retired to deliberate on August 25, 1948. After deliberations began, the court received numerous communications from the jury to the effect that no unanimous verdict could be reached together with requests that the jury be discharged. The jury was requested to continue deliberations. On September 2, 1948, the jury returned a general verdict of guilty and special verdicts of guilty as to overt acts (a), (b), (c), (d), (g), (i), (j), (k). The jury was unable to reach a unanimous verdict as to overt acts (e), (f), (h), (l) and (o). Allegations as to overt acts (m) and (n) were withdrawn by the Government.

The trial judge imposed the death sentence.

## II.

### Did Kawakita Owe Allegiance to The United States?

The definition of treason is a part of the supreme law of the land. United States Constitution, Article III, Sec. 3, provides: "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. * * *"

Title 18 U.S.C.A. § 1, Act of March 4, 1909, c. 321, § 1, 35 Stat. 1088, as it stood at the time of the alleged overt acts, provided:[6] "Whoever, *owing allegiance to the United States,* levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason." [Emphasis ours]

By definition, the crime of treason can only be committed by one owing allegiance to the United States. It is appellant's contention that at the time the acts charged in the indictment were committed, he did not owe allegiance to the United States because, as a dual American and Japanese citizen, he owed allegiance to Japan alone while in that country. According to appellant's reasoning, in his brief, under his dual citizenship he could adhere to the enemy and give it aid and comfort while in the enemy country with impunity. As we shall presently show, dual citizenship does nothing to relieve an American citizen of his citizenship obligations. An American citizen retains that status until expatriated under American law and he is subject to trial and punishment for treason. It is also contended that, having been a Japanese national from birth, Kawakita's act of registration in the family census register, and his other activities during the war, amounted to expatriation from United States citizenship.

■■■ Expatriation is the voluntary renunciation or abandonment of nationality and allegiance. Perkins v. Elg, 1939, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320. In order to be relieved of the duties of allegiance, consent of the sovereign is required. Mackenzie v. Hare, 1915, 239 U. S. 299, 36 S.Ct. 106, 60 L.Ed. 297. Congress has provided that the right of expatriation is a natural and inherent right of all

---

"(k) That on a date in the late spring or early summer of 1945, the exact date of which is to the grand jury unknown, the defendant, Tomoya Kawakita, within the confines of Camp Oeyama, did participate in and assist Japanese military personnel of Camp Oeyama in directing and executing the following cruel, inhuman, and degrading punishment of Woodrow T. Shaffer, a member of the armed forces of the United States who was then and there a prisoner of war of the Japanese government at Camp Oeyama, to-wit, the said Woodrow T. Shaffer was forced to kneel for several hours on a platform with a stick of bamboo placed on the inner side of the joints of his knees and to hold at arm's length above his head a bucket of water and subsequently a heavy log, and was then and there struck and beaten by the said Tomoya Kawakita.

5. Two alternate jurors sat in the case. This was not improper. Robinson v. United States, 6 Cir., 1944, 144 F.2d 392, certiorari denied, 323 U.S. 789, 65 S.Ct. 311, 89 L.Ed. 629; American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, affirmed, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

6. See new Title 18 U.S.C.A. § 2381, Act of June 25, 1948, c. 645, 62 Stat. 807.

people,[7] and has further made a legislative declaration as to what acts shall amount to an exercise of such right.[8] The enumerated methods set out in the chapter are ex-

7. Title 8 U.S.C.A. § 800: "Right of expatriation

"Whereas the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this Government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof; and whereas it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed: Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic."

8. Title 8 U.S.C.A. § 801: "General means of losing United States nationality

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(a) Obtaining naturalization in a foreign state, either upon his own application or through the naturalization of a parent having legal custody of such person: *Provided, however*, That nationality shall not be lost as the result of the naturalization of a parent unless and until the child shall have attained the age of twenty-three years without acquiring permanent residence in the United States: *Provided further*, That a person who has acquired foreign nationality through the naturalization of his parent or parents, and who at the same time is a citizen of the United States, shall, if abroad and he has not heretofore expatriated himself as an American citizen by his own voluntary act, be permitted within two years from the effective date of his [sic] chapter to return to the United States and take up permanent residence therein, and it shall be thereafter deemed that he has elected to be an American citizen. Failure on the part of such person to so return and take up permanent residence in the United States during such period shall be deemed to be a determination on the part of such person to discontinue his status as an American citizen, and such person shall be forever estopped by such failure from thereafter claiming such American citizenship; or

"(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; or

"(d) Accepting, or performing the duties of, any office, post, or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible; or

"(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory; or

"(f) Making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State; or

"(g) Deserting the military or naval service of the United States in time of war, provided he is convicted thereof by a court martial; or

"(h) Committing any act of treason against, or attempting by force to overthrow or bearing arms against the United States, provided he is convicted thereof by a court martial or by a court of competent jurisdiction."

The statute was amended in 1944 by the Acts of Jan. 20, 1944, c. 2, § 1, 58 Stat. 4; July 1, 1944, c. 368, § 1, 58 Stat. 677; Sept. 27, 1944, c. 418, § 1, 58 Stat. 746.

Title 8 U.S.C.A. § 802: "Presumption of expatriation

"A national of the United States who was born in the United States or who was born in any place ouside of the jurisdiction of the United States of a parent who was born in the United States, shall be presumed to have expatriated himself under subsection (c) or (d) of section 801, when he shall remain for six months or longer within any foreign state of which he or either of his parents shall have been a national according to the laws of such foreign state, or within any place under control of such foreign state, and such presumption shall exist until overcome whether or not the individual has returned to the United States. Such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the

pressly made the sole means of expatriation.[9]

The jury was instructed on the applicable law of expatriation and that if appellant were no longer a citizen of the United States he could not be found guilty of treason. The court went further and instructed the jury that if it found appellant believed he was not a United States citizen it should acquit as intent would then be lacking. The verdict indicates that all of these issues were resolved against appellant.

The contention that a conviction of treason must be reversed because the accused did not owe allegiance to the United States was made in Gillars v. United States, D.C.Cir., 1950, 182 F.2d 962. There, defendant was convicted of treason against the United States, committed while in Germany during World War II, for conduct consisting of taking part in psychological warfare against the United States through participating in the recording of radio drama. The argument was advanced, inter alia, that defendant had signed an oath or affirmation of allegiance to Germany, and that this brought about a dissolution of her citizenship and allegiance to the United States. It was held that the trial court did not err in instructing the jury that the statement being vague and informal, it did not come within the purview of Section 401 of the Nationality Act of 1940, Title 8 U.S.C.A. § 801(b).

ate to deprive her of her United States

Litigation on questions of expatriation usually occur in a different setting. The "citizen" is usually seeking to assert that his citizenship was *not* lost by some act which is alleged to amount to expatriation. In Mackenzie v. Hare, supra, plaintiff in error contended that an act of Congress which provided that any American woman who married a foreigner should take the

nationality of her husband, did not operate citizenship on marriage to a subject of Great Britain since, if so intended, it was beyond the authority of Congress. The Supreme Court there stated that it should hesitate long before limiting or embarrassing such an attribute of sovereignty. While it was conceded that a change in citizenship could not be arbitrarily imposed, without the concurrence of the citizen, it was held that the law in question did not have that feature, since it dealt with a condition voluntarily entered into.

In Perkins v. Elg, supra, Marie Elizabeth Elg, who was born in the United States of parents who were natives of Sweden, was taken by her mother to Sweden while still a minor. Shortly after attaining majority, she returned to the United States on an American passport, and was admitted as a citizen. Later, on being threatened with deportation, she sought a declaratory judgment to establish United States citizenship. In holding that United States citizenship was not lost, the Supreme Court stated 307 U.S. at page 329, 59 S.Ct. at page 887, 83 L.Ed. 1320: " * * * As municipal law determines how citizenship may be acquired, it follows that persons may have a dual nationality. And the mere fact that the plaintiff may have acquired Swedish citizenship by virtue of the operation of Swedish law, on the resumption of that citizenship by her parents, does not compel the conclusion that she has lost her own citizenship acquired under our law. As at birth she became a citizen of the United States, that citizenship must be deemed to continue unless she has been deprived of it through the operation of a treaty or congressional enactment or by her voluntary action in conformity with applicable legal principles * * *."

This quotation indicates three ways by which, at the time it was written, expatria-

United States, or to an immigration officer of the United States, under such rules and regulations as the Department of State and the Department of Justice jointly prescribe. However, no such presumption shall arise with respect to any officer or employee of the United States while serving abroad as such officer or

employee, nor to any accompanying member of his family."

9. Title 8 U.S.C.A. § 808: "Exclusiveness of means of losing nationality
"The loss of nationality under this chapter shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this chapter."

tion or loss of citizenship could occur: (1) through operation of a treaty; (2) through congressional enactment; (3) through voluntary action in conformity with applicable legal principles.

It is not contended nor are we aware of any treaty between Japan and the United States which would have application to this particular issue. See Title 8 U.S.C.A. § 810. The reference to a third means of expatriation is foreclosed by the provision in the Nationality Act of 1940, enacted since Perkins v. Elg was written, providing that the means therein provided shall be exclusive. See Title 8 U.S.C.A. § 808, set out in footnote 9, supra. Thus, Kawakita's alleged loss of United States citizenship could only be claimed by virtue of some free and voluntary act on his part which, by the Congressional Act, would be ground for expatriation.

In Savorgnam v. United States, 1950, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287, it was held that a native born American citizen who *voluntarily* obtained Italian citizenship through naturalization in accordance with Italian law, had expatriated herself under the laws of the United States, but acts which would seemingly expatriate under the Nationality Act of 1940 have been held not to have such effect where the element of duress or lack of free choice existed. In Acheson v. Murakami, 9 Cir., 1949, 176 F.2d 953, we upheld a judgment cancelling the renunciation of citizenship by American born persons of Japanese descent, made while they were incarcerated pursuant to civilian exclusion orders issued during World War II. See Kiyoshi Hirabayashi v. United States, 1942, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. The renunciations not being given as a result of free and intelligent choice, but rather because of mental fear, intimidation and coercion, they were held void and of no effect. See Attorney General of the United States v. Ricketts, 9 Cir., 1947, 165 F.2d 193.

Voting in a Japanese election, and service in the Japanese army, acts falling within paragraphs (c) and (e) of Section 401 of the Nationality Act of 1940,[10] have been held not to expatriate where the acts were done under duress. Hatsuye Ouye v. Acheson, D.C.Hawaii, 1950, 91 F.Supp. 129; Etsuko Arikawa v. Acheson, D.C.Cal.1949, 83 F.Supp. 473; Yoshiro Shibata v. Acheson, D.C.Cal.1949, 86 F.Supp. 1; see In re Gogal, D.C.Penn.1947, 75 F.Supp. 268.

Meiji Fujizawa, who testified at the appellant's trial, was a childhood friend of the appellant. Though his case closely parallels Kawakita's in some instances there are differences. Fujizawa was born in Imperial County, California, of parents who were born in Japan, and following his graduation from high school in 1939, went to Japan to further his education. Prior to leaving the United States he officially renounced his Japanese nationality. He, like Kawakita, attended Meiji University and graduated in September, 1943. When the war came on, funds from his parents in the United States ceased and he was required to find employment. He was informed that he could secure no employment unless he recovered his Japanese nationality. He made application for such recovery and upon its being granted, had his name entered upon the Family Register. He then procured employment as an interpreter at the Oeyama Nickel Industry Company, Ltd., where he remained until V-J day. Unlike Kawakita, it appears that Fujizawa assisted the American prisoners in many ways by obtaining for them medical supplies and food.

In 1947 Fujizawa applied to the United States consulate in Japan to be reinstated as a United States citizen, and his application being denied, he brought an action in the United States district court to establish his claim to United States citizenship. The government contended that Fujizawa lost his United States citizenship since his petition for restoration of Japanese citizenship was " * * * Obtaining naturalization in a foreign state * * *", within the meaning of Section 801(a), of Title 8 U.S.C.A. The district court, stressing the principle that acts on their faces tending toward expatriation must be free and voluntary, held that Fujizawa had no

---

10. Title 8 U.S.C.A. § 801, which is set out in footnote 8, supra.

intent to renounce his United States citizenship. Meiji Fujizawa v. Acheson, D.C. Cal.1949, 85 F.Supp. 674. There was no appeal. There is nothing in the Fujizawa case which supports the theory that Kawakita's act of entering his name on the Family Register accomplished his expatriation. The evidence is quite clear that he had no thought that it did either when he acted to have his name entered or afterwards. In leaving the country of his birth, Kawakita's purpose was to visit his aged grandfather in Japan. There he remained to prepare himself for the export-import business in the United States. After entering the University in Japan, he again swore allegiance to the United States when he renewed his United States passport in 1941, and claimed citizenship in the United States when the war was over.

■ We hold that there was evidence in the case justifying the jury finding that Kawakita was a citizen of the United States owing allegiance to the United States during the period in suit.[11]

### III.

Did Kawakita Adhere to the Enemy?

Kawakita is not charged with levying war against the United States. The acts found to have been committed are said to be acts showing adherence to the enemy, giving them aid and comfort.

In Cramer v. United States, 1944, 325 U.S. 1, at page 28, 65 S.Ct. 918, 932, 89 L. Ed. 1441, the court stated: "Treason of adherence to an enemy was old in the law. It consisted of breaking allegiance to one's own king by forming an attachment to his enemy. Its scope was comprehensive, its requirements indeterminate. It might be predicated on intellectual or emotional sympathy with the foe, or merely lack of zeal in the cause of one's own country. That was not the kind of disloyalty

the framers thought should constitute treason. They promptly accepted the proposal to restrict it to cases where also there was conduct which was 'giving them aid and comfort'.

\*  \*  \*  \*  \*  \*

"Thus the crime of treason consists of two elements: adherence to the enemy; and rendering him aid and comfort. A citizen intellectually or emotionally may favor the enemy and harbor sympathies or convictions disloyal to this country's policy or interest, but so long as he commits no act of aid and comfort to the enemy, there is no treason. On the other hand, a citizen may take actions which do aid and comfort the enemy—making a speech critical of the government or opposing its measures, profiteering, striking in defense plants or essential work, and the hundred other things which impair our cohesion and diminish our strength—but if there is no adherence to the enemy in this, if there is no intent to betray, there is no treason."

■ Intent to adhere to the enemy is required in treason. This element of the crime, since it concerns state of mind, is not subject to the two-witness requirement. Cramer v. United States, supra 325 U.S. at page 31, 65 S.Ct. at page 933. Where the overt act charged is of an equivocal or innocent nature in itself, as in the Cramer and Haupt[12] cases, other compelling evidence is required in order to make out the intent to betray. Where, however, as here, the acts found to have been committed are themselves of such a nature as to give rise to strong inferences of a disloyal state of mind, the problem is less difficult. And there is, in addition, the testimony of witnesses introduced by the Government of various statements made by Kawakita as indicative of his state of mind. We set them out in the footnote.[13]

11. The requirement that the defendant in a treason prosecution owe allegiance to the United States is not subject to the two-witness proof requirement. The constitutional safeguard applies expressly to the "overt act". United States Constitution, Article III, Sec. 3, Clause 1. See Cramer v. United States, 1944, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441.

12. Haupt v. United States, 1946, 330 U. S. 631, 67 S.Ct. 874, 91 L.Ed. 1145.

13. The Government introduced witnesses to testify to various statements made by Kawakita as indicative of traitorous intent. These were received, with appropriate instructions, and were to the following effect:

They constitute compelling evidence that appellant's acts sprang from a harbored intent to betray his native country.

## IV.
### Did Kawakita Give Aid and Comfort To the Enemy?

■ The giving of aid and comfort may be defined as conduct or an act which strengthens or tends to strengthen the enemy of the United States and which weakens or tends to weaken the power of the United States to resist or to attack its enemies. Cramer v. United States, supra, 325 U.S. at pages 28, 29, 65 S.Ct. at pages 931, 932, 89 L.Ed. 1441. The minimum function of the overt act is that it show action by the accused which really gave aid

"Get the God damn unloaded"; "It looks like MacArthur took a runout powder on you boys"; "The Japanese were a little superior to your American soldiers."; "From now on, anybody that can't work won't get anything to eat— no rations."; that if the prisoners would raise their quota of work loads they would get more food and be able to quit earlier; "We shot down all your planes. We have very good anti-aircraft. You Americans don't have no chance. We will win the war."; (In answer to a question on how long the war would last) "twenty years and Japan will win it."; (In answer to the question as to whether he would ever return to the United States) that he would come back to the States, and when he got back he would be a big shot because he knew the country, the people and the language; that the prisoners would be in the camp for 50 years and that America would lose the war; "Come on, you guys are not working fast enough. Let us put out a little work here."; "Come on, hurry up. Let's put out more work"; "Get up and get to work."; "Get going. Get to work."; "You guys get going"; "Don't you know you are not allowed to have this kindling? Don't you know it is against the camp rules and regulations?" "Well, you guys needn't be interested in when the war will be over because, you won't go back; you will stay here and work. I will go back to the States because I am an American citizen."; "Get to work, you sons of bitches."; "You are not here at a damn bingo game, you are not here for your damn health."; "I guess you fellows understand the circumstances. If you don't work, why, you will suffer."; (Referring to corned beef that the prisoners had received in Red Cross packages) "You better make good use of that American garbage because you will never get to eat any more of it"; that the Americans were losing the war; "We will kill all you prisoners right here anyway, whether you win the war or lose it. You will never get to go back to the States." ; "What the hell is the matter with you sons of bitches? Here, get going here."; that they could not waste any good medical aid on a bunch of lazy Americans; that the prisoners would never go back to their wives and families; that the Japanese are going to win the war and he is going to be No. 1 man over here and he was coming back to the United States; that the prisoners should hurry up; that he asked a prisoner if he was a damn Yank; (In answer to a question by a prisoner whether he had attended a government sponsored school in the United States) "They never gave me a damn thing."; that the men were getting too much rice; that Japan would win the war if it took a hundred years; that the Japanese were far superior to the American people and if the American army had Japanese officers they could whip the world."; "I wish you were all dead"; "Get out more loads."; that the prisoners were killing time; that the work quota would be raised for the prisoners; "All right, men, back on the job."; that the prisoners needn't worry about the war or the ending of the war, because they would never get back to the United States; that he was going back to the United States to be a big shot, because he knew the Japanese and the English language, both; that the prisoners had not reached their quota in loads of ore and that therefore their noonday soup would be taken away from them; (After a prisoner who was chewing gum denied this and tried to hide it under his tongue) "You lie."; that the Japanese had driven the Americans out of the Pacific; shot down all the American planes, sunk the American ships and that he soon would be coming to the United States where he would be a big shot because he knew the language and the people and the country; that the work quotas were too low; that he ordered the men to thumb their nose at the United States; "I will be glad when all the Americans is dead, and then I can go home and live happy."; "Roose-

and comfort to the enemy. Cramer v. United States, supra 325 U.S. at page 34, 65 S.Ct. at page 934.

We turn to cases, with World War II for their background, to test the sufficiency of the overt act found to have been committed in our case. The earlier cases are referred to in the footnote.[14]

In Stephan v. United States, 6 Cir., 1943, 133 F.2d 87, certiorari denied 318 U.S.

velt was no good."; that he told a prisoner who was resting because of cramps to go out and dig dikons for the next day's meal; that if the prisoners would get out a certain number of cars of ore they could knock off; that the prisoners would have to put out more cars of ore because they quit too early; that Japan was winning the war but it didn't make any difference whether they won or not, the prisoners would not get back home, anyhow; that after Japan had won the war he was coming back to the United States and be a big shot because he could speak the English language; that he called the prisoners lazy yanks, and told them to get out there and get the cars rolling; "Well, it don't make a damn to me which way the war goes because I am going back to the States anyway."; "Anybody who is too sick to work is too sick to eat."; (On the day that work ended in the camp after the surrender of Japan) "You American bastards will be well fed, you will be getting fat from now on."; that prisoners working on a rocky level should get out as much ore as those working in soft dirt; that prisoners should go back to work before the end of their full break period; that a prisoner would be sorry for going into the woods and getting nuts when he should have been working (the nuts had been given to the prisoner by a guard); (after knocking a cigarette out of the hand of a prisoner) that all the prisoner was supposed to do was work for the Japanese people.

14. The following is a summary taken from Cramer v. United States, 1944, 325 U.S. 1, at page 25, 65 S.Ct. 918, 89 L.Ed. 1441, which quotes from the Government's brief filed therein, of all cases in which construction of the treason clause has been involved, omitting grand jury charges and cases in which interpretation of the clause was incidental:

"Whiskey Rebellion cases: United States v. Vigol, C.C.D.Pa.1795, 28 Fed. Cas. 376, No. 16,621, United States v. Mitchell, C.C.D.Pa.1795, 26 Fed.Cas. 1277, No. 15,788 (constructive levying of war, based on forcible resistance to execution of a statute; defendants convicted and later pardoned). House tax case: Case of Fries, C.C.D.Pa.1799,

1800, 9 Fed.Cas. 826, 924, Nos. 5126, 5127 (constructive levying of war, based on forcible resistance to execution of a statute; defendant convicted and later pardoned). The Burr Conspiracy: Ex parte Bollman, 1807, 4 Cranch 75, 2 L. Ed. 554, United States v. Burr, C.C.D. Va.1807, 25 Fed.Cas. 2, 55, Nos. 14,692a, 14,693 (conspiracy to levy war held not an overt act of levying war). United States v. Lee, C.C.D.C.1814, 26 Fed. Cas. 907, No. 15,584 (sale of provisions a sufficient overt act; acquittal). United States v. Hodges, C.C.D.Md.1815, 26 Fed.Cas. 332, No. 15,374 (obtaining release of prisoners to the enemy is adhering to the enemy, the act showing the intent; acquittal). United States v. Hoxie, C.C.D.Vt.1808, 26 Fed.Cas. 397, No.15,407 (attack of smugglers on troops enforcing embargo is riot and not levying of war). United States v. Pryor, C.C.D.Pa.1814, 27 Fed. Cas. 628, No. 16,096 (proceeding under flag of truce with enemy detachment to help buy provisions is too remote an act to establish adhering to the enemy). United States v. Hanway, C.C.E.D.Pa.1851, 26 Fed.Cas. 105, No. 15,299 (forcible resistance to execution of Fugitive Slave Law no levying of war). United States v. Greiner, D.C.E.D.Pa.1861, 26 Fed.Cas. 36, No. 15,262 (participation as member of state militia company in seizure of a federal fort is a levying of war). United States v. Greathouse, C.C.N.D.Cal.1863, 26 Fed.Cas. 18, No. 15,254 (fitting out and sailing a privateer is a levying of war; defendants convicted, later pardoned). Cases of confiscation of property or refusal to enforce obligations given in connection with sale of provisions to the Confederacy: Hanauer v. Doane, 1871, 12 Wall. 342, 20 L.Ed. 439; Carlisle v. United States, 1873, 16 Wall. 147, 21 L.Ed. 426; Sprott v. United States, 1874, 20 Wall. 459, 22 L.Ed. 371; United States v. Athens Armory, D.C.N.D.Ga.1868, 24 Fed.Cas. 878, No. 14,473 (mixed motive, involving commercial profit, does not bar finding of giving aid and comfort to the enemy). United States v. Cathcart and United States v. Parmenter, C.C.S.D.Ohio, 1864, 25 Fed. Cas. 344, No. 14,756. Chenoweth's Case (unreported: See Ex parte Vallandigham, D.C.S.D.Ohio 1863, 28 Fed. Cas. 874, at page 888, No. 16,816 (in-

781, 63 S.Ct. 858, 87 L.Ed. 1148, rehearing denied 319 U.S. 783, 63 S.Ct. 1172, 87 L.Ed. 1727, the indictment which charged the defendant, inter alia, with receiving, furnishing hospitality and entertainment, money, necessities of life to an escaped German prisoner of war, concealing his identity, arranging for his transportation and failing to report him to officials, all in the United States, was held sufficient to charge the defendant with the crime of treason.

Cramer v. United States, supra, was the first occasion on which the Supreme Court reviewed a conviction of treason. Overt acts consisting of meeting and conferring with two Germans who had landed on the shores of the United States for the purpose of sabotage were held to be insufficient as proved to support the judgment of conviction.

But in Haupt v. United States, supra, the Supreme Court held that overt acts consisting of furnishing harbor and shelter, assisting in obtaining employment and helping to buy an automobile, all for defendant's son who was in the United States on a mission of sabotage for Germany, were sufficient overt acts to sustain a conviction of treason. "They have the unmistakable quality", the court stated 330 U.S. at page 635, 67 S.Ct. at page 876, 91 L.Ed. 1145, "which was found lacking in the Cramer case of forwarding the saboteur in his mission."

Chandler v. United States, 1948, 1 Cir., 171 F.2d 921, certiorari denied 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081, rehearing denied, 336 U.S. 947, 69 S.Ct. 809, 93 L.Ed. 1103; United States v. Burgman, D.C.D.C., 1949, 87 F.Supp. 568; Gillars v. United States, C.A.D.C., 1950, 182 F.2d 962, and Best v. United States, 1 Cir., 1950, 184 F. 2d 131, all involved acts of broadcasting German propaganda to the United States in the hope of weakening the United States' war effort by sowing discontent with the government, impairing the morale of the armed forces, and creating dissension among the allied countries. Convictions were had in all of these cases.

Since the jury returned a special verdict as to each overt act found to have

---

dictment bad for alleging aiding and abetting rebels, instead of directly charging levying of war). Case of Jefferson Davis, C.C.D.Va.1867–71, 7 Fed.Cas. 63, No. 3621a (argument that rebels whose government achieved status of a recognized belligerent could not be held for treason; Davis was not tried on the indictment); see 2 Warren, Supreme Court in United States History (1934 ed.) 485–87; Watson, Trial of Jefferson Davis (1915) 25 Yale L.J. 669. Philippine insurrections: United States v. Magtibay, 1903, 2 Phil. 703, United States v. De Los Reyes, 1904, 3 Phil. 349 (mere possession of rebel commissions insufficient overt acts; strict enforcement of two-witness requirement; convictions reversed); United States v. Lagnason, 1904, 3 Phil. 472 (armed effort to overthrow the government is levying war). United States v. Fricke, D.C.S.D.N.Y. 1919, 259 F. 673 (acts "indifferent" on their face held sufficient overt acts). United States v. Robinson, D.C.S.D.N.Y. 1919, 259 F. 685 (dictum, acts harmless on their face are insufficient overt acts). United States v. Werner, D.C.E.D.Pa. 1918, 247 F. 708, affirmed, 1919, 251 U. S. 466, 40 S.Ct. 259, 64 L.Ed. 360 (act indifferent on its face may be sufficient overt act). United States v. Haupt, 7

Cir., 1943, 136 F.2d 661 [sic] (reversal of conviction on strict application of two-witness requirement and other grounds; inferentially approves acts harmless on their face as overt acts). Stephan v. United States, 6 Cir., 1943, 133 F.2d 87 (acts harmless on their face may be sufficient overt acts; conviction affirmed but sentence commuted). United States v. Cramer, 2 Cir., 1943, 137 F.2d 888 [sic]."

The exhaustive comment in 58 Harvard Law Review at page 835, footnotes the following cases as sufficient overt acts: Hanauer v. Doane, 1870, 12 Wall. 342, 20 L.Ed. 439 (sale of goods, intended for enemy use); United States v. Lee, C.C.D.C.1814, 26 Fed.Cas. 907, No. 15,584 (purchase of provisions, intended for enemy); United States v. Greathouse, C.C.N.D.Cal.1863, 26 Fed.Cas. 18, No. 15,254 (fitting out a sailing vessel, intended to act as a privateer); United States v. Werner, D.C.E.D.Pa.1918, 247 F. 708 (words); United States v. Fricke, D.C.S.D.N.Y.1919, 259 F. 673 (holding of funds on deposit, or borrowing money, when for convenience of enemy agent); United States v. Haupt, 7 Cir., 1943, 136 F.2d 661 (holding funds, securing lodgings, furnishing mailing address, when for convenience of enemy agent) [sic].

been committed, the conviction must be sustained if there was a single sufficient, well-proved overt act committed by Kawakita, Haupt v. United States, supra, 330 U.S. at page 641, 67 S.Ct. at page 878, 91 L.Ed. 1145; Chandler v. United States, supra.

Overt act labeled (b) in the indictment, on which the jury returned a verdict of "guilty", consisted of participation in knocking an American prisoner of war into the camp drain or cesspool, and striking and beating him as he attempted to get out. Much is made of the fact that this treatment was administered as punishment for the infraction of camp rules, namely, for extracting needed food from Red Cross packages sent for but withheld from him in a storehouse. It is true that the convention relating to prisoners of war signed at Geneva, July 27, 1929, provides that prisoners of war shall be subject to the laws, regulations, and orders in force in the armies of the detaining power.[15] Sec. V, Chap. 3, Article 45. The same agreement provides, however, that punishments other than those provided for the same acts for soldiers of the national armies may not be imposed. Any corporal punishment, any form of cruelty, is forbidden. Sec. V, Chap. 3, Article 46.

For reasons stated below, we hold that the jury could reasonably find that this act alone, in its setting, amounted to aid and comfort to the enemy.

■ Our review is not limited to a finding of the sufficiency of a single act. Our discussion applies with comparative force to each of the overt acts upon which the jury returned its verdict of guilty: the brutal kicking of Phillip D. Toland in an attempt to compel him to greater exertion in his work [overt act (a)]; the beatings inflicted upon prisoners for using blankets to make crude socks and mittens as protection against the extreme winter weather prevailing at Oeyama [overt act (c)]; the beating of Thomas J. O'Connor to the point of insensibility [overt act (d)]; forcing David R. Carrier and George W. Simpson to run additional times around the camp quadrangle while in a weakened condition to the point of exhaustion [overt act (g)]; the denial of medical care to Johnie T. Carter who lay helpless and in pain from a spinal injury received in the course of his enforced labors [overt act (i)]; the beating of John J. Armellino who, because of illness, was unable to carry the required load [overt act (j)]; participation in inflicting inhuman punishment on Woodrow T. Shaffer [overt act (k)]. These deeds do not indicate reluctant conformity by one who by circumstance finds himself in the camp of the enemy. Separately and cumulatively they reflect the purposeful fulfillment of a desire to give as much aid and comfort to the enemy as was possible in the setting, and indicate a state of mind in keeping with the crime charged.

■ We are mindful of the fact that appellant was not in a policy-making position. However he is not here charged with vicarious liability for the manner in which the prisoner of war camp was conducted. His conduct consisted of personally, and beyond the duty of his employment, willingly assisting the Japanese military in administering cruel and unusual treatment upon weakened United States prisoners of war. The evidence reveals that he enthusiastically deviated from his duties as interpreter in order to participate in the drastic treatment imposed upon the Americans for minor infractions of camp dis-

15. A convention relating to the treatment of prisoners of war was signed by representatives of the United States and forty-six other countries including Japan at Geneva on July 27, 1929.

In response to proposals made by the government of the United States through the Swiss minister in Tokyo, the Swiss minister informed the United States Department of State on January 30, 1942, that " * * * Although not bound by the Convention relative treatment prisoners of war Japan will apply *mutatis mutandis* provisions of that Convention to American prisoners of war in its power".

In response to an inquiry directed to the Department of State by Defense Counsel as to the meaning of the words *"mutatis mutandis"*, it was explained that the Japanese government would apply, on condition of reciprocity, the Geneva Prisoners of War Convention in the treatment of prisoners of war.

cipline. Appellant's own testimony supports the conclusion that he did not act from personal animosity, but was manifesting his attitude toward the country to which he owed allegiance. These acts amounted to as much aid and comfort to Japan as the appellant was able to give in the circumstances, and, through their effect on the prisoners of war at the camp, furthered the Japanese war effort by coercing greater effort toward extracting war-needed ore from the mine. The overt act essential in the crime of treason is present if the act is intended to and does afford aid and comfort to the enemy within the circumstances. Haupt v. United States, supra. The fact that the acts committed by appellant were not of a nature to be decisive of the war or of such a nature as to, in themselves, turn the tide of war, does not cast them as untreasonable.

## V.

### Was the Two-Witness Requirement Satisfied?

The Constitution of the United States requires that " * * * No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court".[16]

█ We hold that there was presented the required testimony of two witnesses to the overt act labeled (b) in the indictment. While there is some understandable uncertainty as to the exact date, there is little question about the exact occasion and as to the conduct of Kawakita on that occasion.

The indicment charged that the act took place during the latter part of April, 1945, with the exact date unknown. The Constitutional requirement was fulfilled by the following testimony:

Witness John L. McCoy recalled that in "April or May", 1945, he returned to camp with a working party and saw Grant standing in the cesspool. He stated, "Kawakita was standing on the side of the pool hitting Grant on the head when I saw him,

and telling him to duck. Grant looked like he was stunned. He didn't seem to understand. He just stood there and shivered and Kawakita hit him repeatedly on the head."

Witness Phillip D. Toland stated that "around the month of May", 1945, at suppertime he "saw Kawakita pushing Grant's head into the water with the long wooden stick he had."

Witness James T. Phillips testified that "Sometime in May or June", 1945, about 4:30 or 5:00 in the evening, he saw Kawakita strike Grant about three times and push him into the cesspool with a "wooden sword".

Witness James A. Caire recalled that in May, 1945, in the afternoon at about 4:00 o'clock, he saw the defendant hit Grant knocking him into the cesspool, and that he was made to stay there by Kawakita, using a "wooden sword".

Witness David R. Carrier stated that around 4:00 o'clock on an afternoon in May, 1945, he saw Kawakita strike Grant twice near the cesspool.

Witness Morton Feinberg testified that sometime in April of 1945, in the afternoon, he saw Kawakita punch Grant and knock him into the cesspool.

Witness William Gage, Jr., testified that between 4:30 and 5:00 in the afternoon, in the middle of May, 1945, he saw Kawakita strike Grant three or four times in the cesspool, with a bamboo pole.

Witness Gid H. Spurlock testified that around in April, 1945, he observed Grant trying to get out of the water in the cesspool, and Kawakita pushed him back with his "saber".

Witness George W. Mayo recalled that "sometime in April or May of 1945" he observed Kawakita strike Grant in the chest with a cane or "wooden saber".

Witness Alexander Holik testified that in April, 1945, between 5:00 and 6:00 in the evening he saw Kawakita shove Grant into the cesspool and swing his saber at him a couple of times.

---

16. The capitalization in the above quotation is in accord with the original script of the Constitution. The Constitution of the United States of America, U. S. Govt. printing office, 1938. Literal print.

Witness Woodrow T. Shaffer testified that in the latter part of April, 1945, he saw Kawakita strike Grant and knock him into the cesspool, and strike him with a stick when he refused to submerge.

Witness David Huddle testified that in April, 1945, around 4:30 or 5:00 o'clock in the afternoon he saw Kawakita hitting Grant over the head with a wooden sword while Grant was in the cesspool.

It would unduly and uselessly lengthen this opinion to set out the testimony of each witness to each overt act found to have been committed. We have carefully studied the testimony from the long rec-ord and find a plurality of witnesses to each of the alleged overt acts which the jury found to have been committed by appellant.

## VI.

### Was There Impropriety In the Jury Proceedings?

Appellant makes numerous contentions of error committed in the jury proceedings. It is contended that the jury was coerced; that the court erred in the instructions given while the jury was deliberating; that the jury separated while deliberating. We set out relevant portions of the jury proceedings in the footnote.[17]

17. On Wednesday, August 25, 1948, the jury retired to deliberate. On August 26, requested portions of the testimony were read to the jury. On Saturday, August 28, the jury made the following communication to the court:

"The jury is unable to arrive at a verdict. A majority of the jury feel there is no probability of doing so."

[Signed] "Wm. W. Andrews
Foreman."

Defense counsel requested the court to discharge the jury. This request was refused and the court, on stipulation of both parties, requested the jury to continue their deliberations. At their own request, the jury was then granted a recess until Monday, August 31. On Monday the jury made the following communication to the court: "The Foreman, personally, respectfully requests permission to approach the bench, or other similar action, for the reason of securing aid and advice of the court, on a matter of procedure concerning the proper deliberating of this jury. This matter is, in my belief, serious and I am supported in this belief by other members of the jury. The court's consideration of this request will be appreciated, and of help."

[Signed] "Wm. W. Andrews,
Foreman."

Defense counsel again moved that the jury be discharged on the ground that any further instructions or deliberations would be in the nature of compulsion. The following proceedings then transpired:

"The Court: Before anything is said I want to caution you again: The court is not interested until you have reached unanimous agreement in hearing anything about how the jury stands numerically or otherwise, as I told you at the time the case was given to you. So in anything that is said, I want to caution you against any statement of any kind as to how you stand numerically or in any other manner.

"What is the question as to procedure?

"The Foreman: Your Honor, it is my belief that we have a juror here who is impeding justice.

"The Court: Now, I don't want to hear anything about it. That is indicating how you stand.

"The Foreman: Your Honor, it is not—

"The Court: It is a question of the procedure.

"The Foreman: It does not indicate how we stand.

"The Court: Very well. Perhaps I am too hasty.

"The Foreman: There are other members. We are not 11 to 1 or anything else.

"The Court: I don't want to hear anything about how you stand.

"The Foreman: I understand. Excuse me, please, your Honor.

"The Court: Proceed, please, Mr. Foreman.

"The Foreman: I believe that this juror is impeding justice, interfering with the course of this trial, and making it so that this jury will never and can never arrive at a verdict; and that we are kept there, not only unable to proceed, but with this person who is personally objectionable to some members of the jury.

"The Court: Is that the question?

"The Foreman: And we wish to know what to do.

"The Court: Well, you have had a rest over the week end as you requested. I hoped that all of you would come back

The issue of coercion of the jury in the manner claimed is one which has received numerous and varied treatment in the federal courts, but reasonably clear principles evolve from the decisions. In Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct.

refreshed and ready to continue your labors today.

"It is not helpful for jurors or any other people to criticise each other. I told you upon giving you the case your sole function here is the ascertainment of the truth from the evidence before you.

"You are not partisans. You are judges—the judges of the facts. Your sole function is to determine the truth from the evidence—the truth as to the facts.

"Now, you were given a number of questions to answer. Numerically, they are quite a goodly number, but you have seen, no doubt, from reviewing the forms of special verdicts handed you the eight questions asked as to each overt act are the same questions with respect to each overt act, that is, insofar as they apply to the various overt acts.

"I suppose all of us are prone to think that when people do not agree with us that the other fellow is wrong. The purpose of instructing the jury to deliberate together is to have you receive each others views and listen to them with due respect and regard for the other fellow. That is the American way.

"We each have our points of view, and sometimes when we discuss the problem together with an open mind and fairly we reach an agreement; and that is why I said when the case was given to you the verdict must represent the individual judgment of each juror. Your verdict must be unanimous. But it is your duty to consult and deliberate with each other with a view to reaching an agreement if you can do so without violence to your individual judgment or conscience.

"I am sure you all understand that from the instructions given. No juror is expected to surrender his or her conscientious convictions as to the credibility of witnesses or as to the weight of the respective evidence for the mere purpose of arriving at a verdict.

"It is not for me to tell the jury how to deliberate or the order in which they are to deliberate. I am sure all of you are mindful of your duties, and I would suggest you now retire and deliberate further.

"The Foreman: May I be heard further, your Honor?

"The Court: Yes.

"The Foreman: I am in a peculiar position because I am one of the few lawyers probably who have ever been on a jury. I have been on juries years ago, I have been on juries during this term, and I think I know something about both sides of the jury, and we go as far as we can with anything.

"When it comes to a point where a supposedly reasonable person or persons feel it is impossible to continue, then we speak. And I spoke Saturday, and I am not alone.

"The Court: We do not want to hear what goes on in the jury room.

"The Foreman: I understand. That was the message that I sent to your Honor: I am not alone.

"I would appreciate if the jury were polled as to an opinion on this because, after all, we have some things to do. If we feel it is utterly impossible, it seems it is not required of us to do a useless act. And, as I say, there is a personal animosity there that could possibly be dangerous.

"The Court: Well, can't you poll yourselves up in the jury room?

"The Foreman: We have, your Honor.

"The Court: It won't help to poll you on such a question as that. I don't even know the question you wish to be polled upon.

"The Foreman: We wish to be excused. We feel that we cannot arrive at a verdict and the jury has been polled.

"Mr. Lavine: I now request that the jury be polled on that question, your Honor.

"The Court: What question?

"Mr. Lavine: Whether they feel it is impossible to reach a verdict.

"Mr. Carter: One of the jurors indicated, raised his hand here a minute ago on some matter.

"The Court: Was that you, Mr. Clancy?

"Juror Clancy: I don't think there is any chance in the world for this jury to agree. We have been locked up five nights and five days and we have not accomplished a thing and we never will. There is animosity crept in and there is everything crept in.

"The Court: Well, you have serious questions there to answer, ladies and gentlemen. There is indication or space provided for a 'yes' or 'no' answer to those questions. Are you to suggest you can't answer any of the questions?

"Juror Clancy: Yes, your Honor.

"The Foreman: That is the sugges-

154, 41 L.Ed. 528, it was urged that certain instructions given to the jury after the main charge was delivered, and when the jury had returned to the court for further instructions, were error. These instructions were in substance: That in a

tion, your Honor. We have not answered any questions.

"The Court: Are you suggesting to me that it is impossible for the jury to agree upon a single answer to any one of the 104 questions propounded?

"Juror Clancy: Yes.

"The Foreman: Yes, your Honor.

"Juror Sidle: Could I say a word, your Honor?

"The Court: Well, if it is—yes; you may.

"Juror Sidle: I have been on many juries. I understand—I think I understand the procedure. We proceeded as instructed and, with the knowledge that we have, to the best of our ability, we discussed it and all of that. In other words, we approached it from every angle. There isn't an angle that I can think of that could be approached that would bring about, as we feel, any positive result or agreement.

"We agree and not agree, and we just can't get anywhere with a situation, in the slang phrase, 'hung up.' That is what we are up against.

"Further, your Honor, we realize, every one of us realizes the importance and the time and energy that has been put into this situation. We realize, further, individually, that we owe all of our energy and all of our time to put forth in this in trying to arrive, and went at it from every angle, and it has gotten to a point where, personally, I feel that there is absolutely nothing can be done.

"Of course, if the court has anything or could do anything to help—but I understand. I am still willing to go ahead as long as my energies will hold up.

"Mr. Lavine: May it please the court, in view of the statement of the three jurors I now again renew my motion to discharge the jury, and call your Honor's attention to the case of Colonel Evans. The jury was only kept out one day in that case.

"The Court: I don't care to hear anything. You just make your motion.

"Mr. Lavine: Yes, your Honor.

"The Court: The motion is denied, unless you have something to say of citations of other cases. Each case stands on its own footing. Was that a treason case?

"Mr. Lavine: No.

"The Court: Was that a case in which there were several months' trial?

"Mr. Lavine: Yes; there was quite a long trial, your Honor.

"Mr. Carter: Three weeks, your Honor.

"The Court: Pardon?

"Mr. Carter: Three weeks, I believe.

"Mr. Lavine: I think anything else now would be in the nature of coercion. That is the ground of my motion.

"The Court: Yes; I understand.

"The court wishes to assist you in every way possible, ladies and gentlemen. Of course, as I have told you throughout the trial, you are the sole judges of the credibility of the witnesses and of the weight and effect of the evidence. You are the sole judges of how you shall deliberate, and while the court may keep you deliberating, the court can't make you deliberate. It is the old story: You can ride a horse to the water, but you can't make him drink.

"When a situation like this is reached, the court tries to be of assistance to the jury. Frequently the position is made—and in many instances, perhaps, properly so—that the court is attempting to coerce the jury or to force the jury to arrive at a verdict.

"A verdict is desirable, but it is only desirable if it is a true verdict. It is only a true verdict if it represents the individual judgment, the honest individual judgment of each juror.

"Do you wish any further suggestions from the court?

"The Foreman: I still insist, your Honor, that it is utterly impossible. Persons of ordinary and reasonable intelligence could discuss things and arrive at any point—

"The Court: That was not my question. My question was: Do you want any further suggestions from the court?

"The Foreman: I renew my request that the jury be dismissed, your Honor.

"The Court: Who was it had up their hand? Mrs. Ziegler, do you have something?

"Juror Ziegler: Perhaps not. May I, your Honor?

"The Court: Yes; you may.

"Juror Ziegler: Would it be out of form to have a new foreman? Mr. Andrews has not been well over the week end and somebody else has not.

"The Court: You are entitled to elect your own foreman at any time.

"Juror Ziegler: That would not help any.

large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with

"The Foreman: I might say that the lady nominated me for foreman, your Honor.

"Juror Ziegler: Yes, I did.

"The Court: Let us not get into that. These personalities do not have anything at all to do with the court, and these personal relationships sometimes are the things that keep us from being open-minded and arriving at a verdict.

"The court wishes to suggest a few thoughts which you may wish to consider along with your consideration of the evidence and all the instructions previously given you.

"This is an important case. The trial has been long and expensive. If you should fail to agree on a verdict, the case is left open and undecided. Like all cases, it must be disposed of sometime. There appears no reason to believe that another trial would not be equally long and expensive; nor does there appear any reason to believe that the case can be again tried any more exhaustively than it has been on the part of either side.

"Any future jury must be selected in the same manner and from the same source as you have been chosen. So there appears to be no reason to believe that the case would ever be submitted to twelve men and women more intelligent, more impartial, more competent to decide it, or that more or clearer evidence could be produced on the part of either side.

"As I told you at the time I instructed you, it is rarely possible to prove or disprove, either way—it is rarely possible to prove or disprove anything to an absolute certainty.

"Upon brief reflection, the matters I have mentioned suggest themselves, of course, to all of us who have sat through this trial. The only reason they are mentioned is because some of them may have escaped your attention, which must have been fully occupied in your consideration of all the evidence up to this time. These are matters which, along with other and perhaps more obvious ones, remind us of the desirability that you give the jury's unanimous answer to the questions asked on the 13 forms of special verdict submitted, and that you unanimously agree upon a general verdict of guilty or not guilty if you can do so without violence to your individual judgment and your conscience.

"It is unnecessary for me to say again that the court does not wish any juror to surrender his or her conscientious convictions. As I stated at the time the case was submitted to you, do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of other jurors, or for the mere purpose of arriving at a verdict.

"As I said at the time, also, it is your duty as jurors, however, to consult with one another and to deliberate with a view of reaching an agreement if you can do so without violence to individual judgment.

"Each of you must decide the case for yourself, but you should do so only after a consideration of the evidence with your fellow jurors. And in the course of the deliberations you should not hesitate to change an opinion when convinced it is erroneous. And certainly a juror should never hesitate to change his opinion by reason of personalities, if they are convinced from the evidence and from the arguments made in the jury room that the opinion they had previously held is erroneous.

"In order to bring 12 minds to unanimous results, you must examine the questions submitted to you with candor and frankness, and with a proper regard and deference to the opinion of each other. That is to say, in conferring together you should pay due attention and respect to each others opinions and listen to each others arguments with a disposition and open-minded—a disposition to be convinced. If the much larger number of you are for a conviction, each dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors who have heard the same evidence, with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

"On the other hand, if a majority or any substantial number of you are for acquittal, the other jurors ought seriously to ask themselves again whether they do not have reason to doubt the correctness of a judgment which is not concurred in by many of their fellows.

"Mr. Lavine: Had your Honor concluded?

candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that,

"The Court: No. The court and the jury are here to come to a just and righteous result in this case. You are as anxious to reach that result, I know, as I am.

"As I have stated to you before, you are not partisans. You are judges—judges of the facts and your sole purpose is to ascertain the truth as to the facts from the evidence, and in ascertaining the truth as to the facts you are the sole and exclusive judges.

"You must know it by heart by now. You are the sole and exclusive judges of the credibility of the witnesses and the weight and effect of all the evidence, and in the performance of your duties you are entitled to disregard, disregard entirely all comments of the court and counsel in reaching your own judgment and in making your own findings as to the truth as to the facts.

"Let me repeat again so that you will not feel that any remarks I have made are intended to put any coercion or pressure upon you: No juror is expected to yield a conscientious conviction he or she may have as to the credibility of any witness or as to the weight or effect of any evidence but, as I have previously said, it is your duty, members of the jury, to agree, unless after a full and impartial consideration of all the evidence with your fellow jurors, to agree would do violence to your individual judgment and conscience.

"There has been some suggestion here—there was Friday—that some of you were very tired. Perhaps I should have suggested to you at the outset that you may be as leisurely in your deliberations as the occasion and circumstances may require. Sometimes jurors may fail to agree because they hurry too much to try to agree. Sometimes people do that.

"I do not speak in any critical vein. We are dealing with an attempt to get 12 human beings to arrive at a common conclusion as to the truth.

"You will remember at all times if any doubt remains in your mind, any reasonable doubt as to the guilt, the defendant is entitled to your verdict of acquittal.

"The bailiffs have been instructed to take you to your meals whenever you wish to go, to take you to your hotel whenever you wish to go. You are to take all the time you may feel necessary for your deliberations.

"You may now retire and continue your deliberations as your good and conscientious judgment as reasonable men and women may determine.

"The Foreman: May I be heard further, your Honor? I think the court does not understand the point that I raise. No one here objects to which way any juror voted, but the manner and statements made indicate to us this long time that it is going to be utterly impossible to complete this. It is not—no one here objects to any way or which way.

"The Court: I understand that, Mr. Andrews.

"The Foreman: I was not trying to state how the jury stood. But there is one question—

"The Court: But sometimes, when people differ with us, that affects our opinion of them, you know.

"The Foreman: I understand that, but as time goes by, it seems to me that sufficient time has gone by. That is my personal opinion and I have a great hesitancy for returning to the jury room.

"The Court: Well, Mr. Andrews, you are a lawyer. Let me suggest to you that maybe you are able to arrive at your conclusion in some of these matters more rapidly by reason of your legal training. It may be necessary for some of the others to catch up with you.

"The Foreman: I am not alone, sir.

"The Court: Well, that may be true, too.

"Mr. Lavine: I again renew my request, your Honor, in view of that statement, to discharge the jury.

"The Court: Do you have something further, Mrs. Ziegler? You raised your hand.

"Juror Ziegler: I don't feel like going out under the circumstances; I really don't.

"The Court: It is very difficult, ladies and gentlemen of the jury, to the court to feel that you have completed your deliberations to the extent that you could under the court's instructions and not be able to arrive at a unanimous answer to one of the 104 questions presented to you. That may be the case.

"It has been a long trial, as I say, and I know you are tired and you would like to be done with it. But in all the circumstances which have been mentioned here, I would ask you to deliberate further, to try further to see if you can't come to a unanimous agreement. If you

if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

It was held that there was no error in these instructions. The court stated 164 U.S. at page 501, 17 S.Ct. at page 157: "While, undoubtedly, the verdict of the juror should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the juryroom. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself * * *." See Burton v. United States, 1905, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482; Allis v. United States, 1894, 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91.

Appellant relies strongly on Bollenbach v. United States, 1946, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350. In that case a conviction was reversed because on inquiry from the jury, the trial judge gave an instruction which stated the substantive law involved incorrectly. That question is not presented in this case. Nor are we faced with the problem presented in Brasfield v. United States, 1926, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345, where the court held that an inquiry by the trial judge to a jury unable to agree, asking the extent of its division numerically, was ground for reversal, its tendency being coercive. The trial judge in the case before us cautioned the jury repeatedly against revealing their numerical division.

In Hyde v. United States, 1912, 225 U.S. 347, 382, 32 S.Ct. 793, 807, 56 L.Ed. 1114, it was contended that the verdict was a result of coercion by the court. The jury had returned to the courtroom and the foreman had announced that they were unable to agree. The court instructed the jury to retire for further deliberation, and make another effort to agree upon a verdict, charging them: "* * * that should they render a verdict, it must be one to which they all freely agreed; that the law would not recognize a coerced verdict or one which was not the free expression of the views and opinions of the jurymen, and that if, after another conscientious effort, the jury still fail to agree, they should return to the court and so state. That it was not the purpose of the court to unduly prolong their deliberations, and that if they could not conscientiously and freely agree upon a verdict, they would be discharged."

Several hours later they were brought into court and again declared they were unable to agree, and the court instructed them

can't answer all the questions, answer as many as you can. And remember, again, that no juror is expected to surrender his honest convictions if, after full deliberation and attention to the views of his or her fellow jurors, he or she remains convinced of the correctness of his or her stand on any matter involved.
"You may now retire."
On Tuesday, August 31, a further communication from the jury to the court was received:

"Your Honor: The jury respectfully requests the court's clarification of all the instructions.
"Respectfully submited,
Elsie B. Nickel."
Again denying the motion of defendant that the jury be discharged, the court attempted to further clarify the instructions, and the jury again retired to deliberate.
On the afternoon of Thursday, September 2, 1948, the jury returned a general verdict of guilty, and a verdict of guilty as to eight of the overt acts charged.

further, after consultation with counsel, suggesting a consideration of the possibility of the guilt of some of the defendants and not of others. A short time later, the jury returned a verdict of guilty as to certain of defendants and not guilty as to others.

The Supreme Court rejected the contention that the jury was coerced by the court. The court stated 225 U.S. at page 383, 32 S.Ct. at page 808: " * * * It is true the trial was a long one and that the jury were not allowed to separate. Neither fact is unusual in criminal trials; the first is often necessary, the second often expedient, and contributes to an impartial judgment for and against defendants. It is true that the jury was in consultation for three days and nights without agreement, but the case was unusual in its issues and evidence and the detailed attention that was required.

"It well might be that jurors should not see the exact bearing of the evidence as it affected particular defendants until the final instructions of the court, which we have set out and about which counsel were consulted. The court took care to say to the jury that the law would not recognize a coerced verdict, and that it was not the court's intention to unduly prolong their deliberations, and, if, after another effort, 'they could not conscientiously and freely agree upon a verdict, they would be discharged.' It is hard to believe that with that admonition yet in their ears they bartered their convictions, with that promise expressly made to them, they were coerced by a threat of confinement to acquit those who they were convinced were guilty, or convict those who they were convinced were innocent."

In United States v. Haupt, 7 Cir., 1946, 152 F.2d 771, 779, a conviction of trea-

son was attacked because the jury deliberated 28 hours without sleep. The judgment was affirmed. It was held that the case was one which necessitated extended deliberation of the jury, considering the length of the trial, the number of issues, the seriousness of the offense, and the responsibility of each juror. The Supreme Court dismissed the same contention in a sentence. Haupt v. United States, 1946, 330 U.S. 631, 643, 67 S.Ct. 874, 91 L.Ed. 1145, rehearing denied 331 U.S. 864 [18], 67 S.Ct. 1195, 91 L.Ed. 1869.

While there is language in Peterson v. United States, 9 Cir., 1914, 213 F. 920, which seems to support the appellant, the import of the language there used is fully explained in our later expression in Shea v. United States, 9 Cir., 1919, 260 F. 807, which reviews the Supreme Court decisions more fully.

■ The contested instructions were not coercive in effect. They were given on Monday, August 30, 1948. The final words of the trial court on this occasion were that no juror was expected to surrender his honest convictions if, after full deliberation and attention to the views of his or her fellow jurors, he or she remained convinced of the correctness of his stand. The verdict was not rendered until 3:45 P.M. on Thursday, September 2, 1948. The jury agreement after three days had elapsed following the final instruction to the jury, as it seems to us, was because the jurors came to agreement after the storms of personality clashes had been cleared away by the presiding judge. No complaint was made nor was any indication given to the effect that personal differences occurred during this period. It is far more likely that the earnest and thorough talk to the jury by the judge

---

18. See proceedings in United States v. Sorcey, 7 Cir., 1945, 151 F.2d 899, certiorari denied 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021; Boehm v. United States, 8 Cir., 1941, 123 F.2d 791, certiorari denied, 315 U.S. 800, 62 S.Ct. 626, 86 L. Ed. 1200, rehearing denied, 315 U.S. 828, 62 S.Ct. 794, 86 L.Ed. 1223; United States v. Olweiss, 2 Cir., 1944, 138 F. 2d 798, motion denied, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047; United

States v. Samuel Dunkel & Co., 2 Cir., 1949, 173 F.2d 506; Nick v. United States, 8 Cir., 1941, 122 F.2d 660, 138 A.L.R. 791, certiorari denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, rehearing denied, 314 U.S. 715, 62 S.Ct. 411, 86 L.Ed. 570, motion denied, 316 U.S. 710, 62 S.Ct. 1103, 86 L.Ed. 1776; but see Edwards v. United States, 8 Cir., 1925, 7 F.2d 598; Gideon v. United States, 8 Cir., 1931, 52 F.2d 427.

528

impressed the members with their duties to eliminate personal conflict of temperament and weigh the evidence in the cold scale of impersonal logic. Had the judge deviated in but a comparatively small degree from a plain and unimpassioned appeal to the jury members to eliminate personal antagonisms and get down to earnest consideration of the evidence and the instructions, a strong case would have been made on this assignment of error. We do not underestimate the strength of the argument made on this assignment. But there is nothing tangible in the record to override the presumption that the verdict returned was the result of honest and conscientious agreement of twelve minds. The proceedings speak eloquently of the clash of strong, unappeasing minds at work on a decision which required the closest adherence to "The Still, Small Voice Within". We do not regard the lapse of time as decisive in the case.

There was no improper separation of the jury during the trial. The purpose of keeping a jury in one body during the trial and not permitting the members to separate except under the supervision of the bailiff or officers of the court, is to make sure that nothing shall influence them in the consideration of the case. Baker v. Hudspeth, 10 Cir., 1942, 129 F.2d 779, certiorari denied Baker v. U. S., 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128, rehearing denied 312 U.S. 715, 61 S.Ct. 731, 85 L.Ed. 1145. The fact that a juror was permitted to go to the barber shop under the supervision of a bailiff, and that other jurors were permitted to see a doctor under supervision of a bailiff does not give rise to a finding that the jurors were subjected to prejudicial influence. Allowing jurors to maintain reasonable standards of health and cleanliness under court supervision is a necessary adjunct of the jury system.

So far as the record discloses, the conduct of the court and its rulings on the trial were fair and considerate of the rights of the defendant. In none of the matters referred to do we find error.

## VII.
### Was the Punishment Excessive?

Title 18 U.S.C.A. § 2, Act of March 4, 1909, c. 321, § 2, 35 Stat. 1088, provided:[19] "Whoever is convicted of treason shall suffer death; or, at the discretion of the court, shall be imprisoned not less than five years and fined not less than $10,000, to be levied on and collected out of any or all of his property, real and personal, of which he was the owner at the time of committing such treason, any sale or conveyance to the contrary notwithstanding; and every person so convicted of treason shall, moreover, be incapable of holding any office under the United States."

The appellant contends that the sentence imposed is arbitrary. We think not. So long as it is within the limits prescribed by the statute it is not legally excessive. Vlassis v. United States, 9 Cir., 1925, 3 F.2d 905. No legal error is committed in imposing a severe sentence so long as it does not exceed the maximum set by statute. Cardenti v. United States, 9 Cir., 1928, 24 F.2d 782. Consult Stephan v. United States, 6 Cir., 1943, 133 F.2d 87, certiorari denied 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1148, stay of execution ordered, 318 U.S. 746, 63 S.Ct. 984, rehearing denied 319 U.S. 783, 63 S.Ct. 1172, 87 L.Ed. 1727, execution ordered D.C., 50 F.Supp. 738; Capone v. United States, 7 Cir., 1931, 51 F.2d 609, 76 A.L.R. 1534, certiorari denied 284 U.S. 669, 52 S.Ct. 44, 76 L.Ed. 566; Cochran v. United States, 8 Cir., 1930, 41 F.2d 193; Muench v. United States, 8 Cir., 1938, 96 F.2d 332; United States v. Sorcey, 7 Cir., 1945, 151 F.2d 899, 902, certiorari denied 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021. We hold that the record is free from reversible error.

The author of this opinion having immersed himself in the long record of this case feels it proper for himself alone to say that the trial proceedings reflect credit upon the trial judge and all of the attorneys for both the government and the defendant-appellant. A special word of commendation is due the attorney for de-

19. See new Title 18 U.S.C.A. § 2381, Act of June 25, 1948, c. 645, 62 Stat. 807.

fendant-appellant who with inadequate compensation and in the interests of justice spared no effort or time on behalf of his client.

The judgment is affirmed.

### On Rehearing.

PER CURIAM.

After a re-examination of the evidence in this capital punishment case and after a renewed study of the applicable authorities in the light of appellant's comprehensive petition for a rehearing, we do not find good cause for the granting of such petition. Accordingly, the petition for a rehearing is hereby denied.